**Marquis Aurbach Coffing**
Brian R. Hardy, Esq.
Nevada Bar No. 10068
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
bhardy@maclaw.com

Jonathan O'Brien, NYB No. 5043369
(Pending Admission Pro Hac Vice)
Law Office of Jonathan O'Brien
Telephone: (646) 308-1689
43 W. 43rd St, Suite 002
New York, NY 10036
Jobrien@burnsobrienlaw.com

*Attorneys for Plaintiffs William Clark and Gabrielle Clark*

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| GABRIELLE CLARK, individually and as parent and guardian of WILLIAM CLARK and WILLIAM CLARK, individually,<br><br>Plaintiffs<br><br>.<br><br>STATE PUBLIC CHARTER SCHOOL AUTHORITY, DEMOCRACY PREP PUBLIC SCHOOLS, DEMOCRACY PREP PUBLIC SCHOOLS, INC., DEMOCRACY PREP at the AGASSI CAMPUS, DEMOCRACY PREP NEVADA LLC, SCHOOL BOARD of Democracy Prep at the Agassi Campus, NATASHA TRIVERS individually and in her official capacity as Superintendent and CEO, ADAM JOHNSON, individually and in his official capacity as Executive Director and Principal, KATHRYN BASS individually and in her capacity as Teacher, JOSEPH MORGAN, individually and in his official capacity as Board Chair, KIMBERLY WALL individually and in her capacity as assistant superintendent, and John & Jane Does 1-20<br><br>Defendants. | Case Number:<br>2:20-cv-02324-RFB-VCF<br><br><br>**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

*MARQUIS AURBACH COFFING*
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Plaintiffs, Gabrielle and William Clark (collectively "Plaintiffs") by and through their attorneys of record herein, hereby submit their Emergency[1] Motion for Preliminary Injunction and Application for Temporary Restraining Order. This Motion and Application are made and based upon the papers and pleadings on file herein, the following Memorandum of Points and Authorities, and any oral argument allowed at the time of hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

William Clark ("William") seeks to have his failing grade for the "Sociology of Change" class removed. Defendants alter, inflate and misrepresent their grading, attendance and curriculum as it suits them for various purposes. This is demonstrated in teacher declarations and documentary evidence attached hereto and to the Complaint. If Defendants can contort their irregular grading practices for their own purposes, they can do so for William.

Defendants coercive identity confession and labeling exercises are unlawful, ongoing and should be enjoined and declared harassment, a hostile environment and unconstitutional. Defendants compelled speech and retaliated against William, violating the First Amendment to the Constitution of the United States, 42 U.S.C. §§ 1983, the Equal Protection Clause, Title VI of the Civil Rights Act and Title IX. Defendants actions are not in the public interest, which is why they endeavor to disguise it, and would substantially and irreparably harm Plaintiffs if left unchecked. Plaintiffs will prevail on the merits of this matter, and the injury faced by Plaintiffs is far greater than any possible injury that could be sustained by Defendants from the requested injunctive and declaratory relief.

---

[1] Plaintiffs provided notice on the afternoon of January 14, 2020, to Wilmer Hale, Democracy Prep's retained outside counsel by email that Plaintiffs would soon be seeking a temporary restraining order. Plaintiffs announced their intention to seek emergency and preliminary relief in the Complaint, filed while school was on holiday break. Plaintiffs contacted counsel for all Democracy Prep entities in an email on December 28, 2020 seeking resolution or compromise. Defendant's responded that they were retaining outside counsel. Plaintiffs meet and conferred with the State Public Charter School Authority on January 8, 2020. Plaintiffs conferred with Democracy Prep outside counsel Wilmer Hale at length on January 11, 2021.  Wilmer Hale agreed to accept service; however, to date, the Parties have been unable to reach any resolution.  As such the instant motion and application are necessary.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## II.    **PARTIES**

William is in the 12th grade at Defendant Democracy Prep at Agassi Campus (DPAC), and the son of Gabrielle Clark ("Gabrielle"). Defendant State Public Charter School Authority ("SPCSA") certifies, authorizes, screens and monitors DPAC, and recently renewed its contract with Defendants DPAC, Democracy Prep Nevada LLC, and Democracy Prep at the Agassi Campus School Board ("School Board"). SPCSA's acquiescence and deliberate indifference to DPAC's discriminatory and unconstitutional acts amounts to practice and custom with regards to the constitutional violations discussed herein. Defendant Democracy Prep Public Schools ("DPPS") is a public charter management organization and does business in Nevada.

DPAC is a K-12 member school of the DPPS network in Clark County, Nevada. Defendant Democracy Prep Public Schools, Inc. is the only managing member of Defendant Democracy Prep Nevada LLC whose executive director is DPAC Principal Adam Johnson ("Principal Johnson"). Defendant Democracy Prep Nevada LLC is a legal entity registered under the laws of Nevada, and the contract between it and the SPCSA describes it as a separate entity from the DPAC charter school itself.[2]  The DPAC School Board is a unique entity with final oversight of DPAC operations, curriculum and disciplinary matters. It is duty bound according to its contract with SPCSA to ensure non-discrimination in accordance with Title IX and VI and federal and state law.

Defendant Kathryn Bass ('Ms. Bass") is a teacher and employee at DPAC. She teaches the compulsory "Sociology of Change" class in which William was enrolled, and she required William and his fellow students to reveal and make professions about their gender, sex, religious and racial identities. She further subjected those professions to public interrogation, scrutiny and derogatory labeling as part of a curriculum designed, promoted and implemented by DPPS and its CEO and Superintendent Natasha Trivers ("Superintendent Trivers").

---

[2]     http://charterschools.nv.gov/uploadedFiles/CharterSchoolsnvgov/content/News/2020/200626-Democracy-Prep-at-Agassi-Contract-draft-5-21-20-clean.pdf

Defendant Kimberly Wall ("Ms. Wall") is assistant superintendent of DPPS in New York City.  Defendant Joseph Morgan ("Mr. Morgan") is Chair of the School Board at DPAC. All named Defendants are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

III.   **FACTS**

**A.     DEFENDANTS' IRREGULAR, SUBJECTIVE GRADING PRACTICES.**

But for Defendants' intentional racial prejudice, William would not have received a failing grade for his "Sociology of Change" class. Plaintiffs support this with DPAC teacher and administrator testimony and business records which show the irregular and subjective nature of Defendants' grading practices. Further, the evidence establishes the Defendants deliberately and routinely changed grades and coursework requirements to preserve the school's enrollment-dependent tuition revenue and for other non-educational reasons. Moreover, Defendants stigmatized William with a grade that their own handbook says Defendants do not confer as a matter of official policy.[3] Grade misrepresentation for public relations purposes and administrators' personal agendas was compounded by the Defendants sudden altering of coursework, curriculum and credit requirements.[4] All of this information was withheld from William.

**B.     DEFENDANTS' UNSAFE, RACIALLY HOSTILE ENVIRONMENT.**

Gabrielle told DPAC and DPPS in a mid-November meeting "You put a bullseye on my son's back."[5] Ms. Clark's fear was reasonable,[6] and compounded by DPPS' and DPAC's financial mismanagement, which has caused school facilities to fall into a state of disrepair

---

[3] *See* ECF No. 1 ¶ 17

[4] *Id.*

[5] *See* ECF No. 1 ¶ 3

[6] *See* ECF No. 1 ¶ 54

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

and led to neglect and inadequate supervision of students.[7] The school is understaffed, the older and experienced teachers were terminated in order to reduce salary costs[8] and DPPS and DPAC policies enforced by Principal Johnson and Superintendent Trivers discouraged police response and investigations into reported incidents at DPAC on subjective ideological grounds.[9] In fact, a young student died on campus while State mandated monitoring procedures failed to be observed.[10] This situation persists and aggravates the hostile environment deliberately created and tolerated by Defendants.

### C.    DEFENDANTS MANDATORY IDENTITY CONFESSION EXERCISES AND STEREOTYPE HARASSMENT

At the start of his final school year, William began the year-long "Sociology of Change" class required for all DPAC seniors and taught by teacher Ms. Bass. The class runs in tandem with another project-based class, "Change the World," in which students carry out a political or social work project under the guidance of Ms. Bass and with input from other students.[11]

After Plaintiffs objected in early September to the coercive and ideological nature of the "Sociology of Change" class, Principal Johnson informed Gabrielle that the theoretical basis of the revamped "Sociology of Change" course is known as "intersectionality," and is inspired by political activist, academic and "Critical Race Theory" proponent Kimberlé Crenshaw.[12] William's first graded assignment for the class required him to reveal his racial,

---

[7] Bentheim ¶ 11, 23; Tishkowitz ¶ 5-8

[8] *Id.*

[9] Bentheim Declaration, ¶ 14; Tishkowitz Dec, ¶

[10] Tishkowitz Declaration, ¶ 6; Bentheim Declaration, ¶ 13

[11] *See* ECF No. 1, Exhibit D.

[12] Defendants would later deny in a meeting with Gabrielle that the class was infused with "Critical Race Theory."

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

sexual, gender, sexual orientation, disabilities and religious identities. William was required to submit his identities "if any" in a homework assignment due by September 21, 2020.

"Hello my wonderful social justice warriors!" Defendant Ms. Bass greeted William and his classmates on or about September 8, 2020.[13] Ms. Bass then requested each student to "label and identify" their gender, racial and religious identities as part of "an independent reflection" exercise which was graded. The next step was to determine if "that part of your identity have privilege or oppression attached to it."[14] Privilege was defined as "the inherent belief in the inferiority of the oppressed group."[15] Ms. Bass's material stated who qualified as oppressors, and who in virtue of their gender and race harbored "inherent belief in the inferiority" of others.[16] As a result, Ms. Bass explicitly assigned moral attributes to pupils based on their race, gender, sexual orientation and religion. William did not wish to profess his identities on command in a non-private setting. William felt that if he had submitted to the terms of this exercise, he would have been in effect adopting and making public affirmations about his racial, sexual, gender identities and religious background that he believed to be false and which violated his moral convictions.

A "vocab reminder" visual graphic from the same class instructed participants that "oppression" is "malicious or unjust treatment or exercise of power."[17] The lesson categorized certain racial and religious identities as inherently "oppressive," singling these identities out in bold text, and instructed pupils including William who fell into these categories to accept the label "oppressor" regardless of whether they disagreed with the pejorative characterization of their heritage, convictions and identities. The familial, racial, sexual, and religious identities

---

[13] *See* ECF No.1, Exhibit A at Pg. 30.

[14] *Id.* at Pg. 11.

[15] *Id.* at Pg. 2.

[16] *Id.*

[17] *Id.* at Pg. 23.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

that were officially singled out and characterized as "oppressive" were predetermined by Defendants' class material from the outset, highlighted as such in bold text, antecedent to any discussion between student and teacher. William could not bring himself to accept or affirm these labels, which he conscientiously believed were calumny against his self-identity and his family.

After Defendant Ms. Bass directed William and his peers to "label and identify" their various identities, and place them in the designated "oppressive" categories, the next step was to "breakout" into groups to discuss with other pupils, asking and answering accusatory personal questions, including "Were you surprised with the amount of privilege or oppression that you have attached to your identities" and "How did this activity make you feel."[18] Those students who did not "feel comfortable or safe enough to do so," were permitted to refrain from divulging the information to other students in their group. The pre-set structure of the class ensured that any pupil of a certain perceived race, gender or sex who declined to participate would highlight one's status as an "oppressor" who harbored inherent "privilege." Pupils remained visible to one another in the virtual classroom. Defendants' class presentation also stated that denial of these identity characterizations amounts to unjust privilege "expressed as denial."[19]

The official, derogatory labeling included in the DPPS/DPAC curriculum programming was not only based upon invidious racial distinctions, but also upon religious, sexual, and gender discrimination. In addition to the "white" racial identity, Defendants singled and assigned inherent moral attributes to pupils who fell into male, heterosexual gender/sex identities and Christian religious categories. Calling such identities intrinsically oppressive, the materials defining "oppression" as "malicious or unjust" and "wrong."[20].

---

[18] *Id.* at Pg. 22.

[19] *Id.* at Pg. 2.

[20] *Id.* at Pg. 11.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

William was compelled to participate in public professions of his racial, religious, sexual, and gender identities, and would be labeled as an "oppressor" on these bases by Defendants. William was obliged to profess himself complicit in "internalized privilege [which] included acceptance of a belief in the inherent inferiority of the [corresponding] oppressed group" as well as supporting "the inherent superiority or normalcy of one's own privileged group." As a male, William's identities were "malicious and unjust" and "wrong" whether or not he was conscious of these alleged facts, and whether or not he was personally responsible for any acts or omissions[21]. William's female teacher instructed him that only members of the male sex were capable of committing "real life interpersonal oppression", because "interpersonal sexism is what men to do women"[22].

William and his mixed-race family belong to many of the groups characterized as "oppressive" and "wrong" by Defendants. The assignment of these derogatory labels based upon racial, sexual, gender identities and religious upbringing created a hostile environment for William, who for instance was raised according to Judeo-Christian precepts and traditions by his mother. Defendants' curriculum programming and Ms. Bass' actions labeled Christianity as an example of an oppressive ideology and institution against which students should "fight back" and "unlearn."[23] The material makes explicit the "unlearning" is to take place in class, at the direction of the teacher. In fact, one slide that William was exposed to states "We have a lot of unlearning to do."[24]

Professing one's racial, sexual and religious identities on command, and exposing those professions to the scrutiny of others, was a regular and official practice of the DPPS/DPAC "Sociology of Change" curriculum programming, which William was required

---

[21] *Id.*

[22] *Id.* at Pg. 9.

[23] *Id.* at Pg. 33

[24] *Id.* at Pg. 35

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

to perform repeatedly, and not just in the beginning classes. The terms of this practice were authored by DPPS, as DPAC and DPPS "On the Google Doc write down your individual identity," Defendant Ms. Bass directed William and his classmates in one virtual online session.[25] "Fill out your identities again," she reiterated. Individual identities to be written down and submitted for grading included:

Race/Ethnicity/Nationality: _____
Gender:_____
Socioeconomic Status:_____
Disabilities: _____
Religion: _____
Age: _____
Language: _____ [**Id.**] [Clark Complaint. ¶ 35]

The above assignment was graded and the assignment sheet included an asterisked caveat at the end: "This list is private! No one else will see it." The assurance proved to be false, however, because the entry of identities was required to be submitted to the teacher, which she could see and muse over; and although students like William were not informed of the fact, by entering their intimate personal information onto the student assignment Google Doc database, it immediately became visible to all DPAC teachers and administrators and remains so to this day, in contravention of the written privacy assurance Defendants gave to William and his fellow students, as Plaintiffs and counsel were later informed by Defendants.

Defendants conceded in meetings with Plaintiffs in mid-November and again in early December with counsel that required exercises and graded homework assignments involving identity confessions as described above occurred and was encouraged. Defendants refused to assure Plaintiffs that graded identity confession assignments or in class exercises would not occur again in future "Sociology of Change" and "Change the World" classes that William is required to attend for graduation. Defendants' current position is that they will not expunge

---

[25] *Id.* at Pg. 34.

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

the failing grade they gave William or allow him to take an alternative class but that he may partially repair his grade for last trimester's "Sociology of Change" class if he completes all the assignments, which would still not be full credit. [Clark Complaint. ¶ 37]

Defendants' curriculum made attacks against the integrity of William and his mother's family relationships. Families "reinforce racist / homophobic prejudices,"[26]. William's deceased father was white, and he died when William was too young to know him. The DPPS/DPAC teacher presentation material purports to supply substantial information as to what sort of man he was, however, and what sort of relationship he had with William's black mother. "Interpersonal racism is what white people do to people of color close up," one "Sociology of Change" curriculum slide declares, with examples including "beatings and harrasments."[27] Defendants do admit that not all white people may be guilty of individually performing such acts, but because white people belong to a "dominant group," invidious distinctions are justified: "*Some* people in the dominant group are not consciously oppressive…Does this make it OK? No!"[28].

With green eyes and blondish hair, William is generally regarded as white by his peers, and despite having a black mother, is so light skinned that he is usually presumed "white" by all others. He is the only apparent white boy in his class, in fact, and is regularly reminded of it. Still, the DPPS/DPAC "Sociology of Change" curriculum programming which William had to submit to says not to worry.[29]

---

[26] *Id.* at Pg. 36.

[27] *Id.* at Pg. 9.

[28] *Id.* at Pg. 10.

[29] *Id.* at Pgs. 8, 24.

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

One of William's first "Sociology of Change" sessions at DPAC on or about September 10, 2020 erupted into racially charged tumult, and Ms. Bass terminated discussion when students, including William, objected to her derogatory, race-based labeling. Her actions both intimidated him from speaking out in class further and was an official endorsement of an ideology regarding intimate personal matters that he could not in conscience affirm. Gabrielle immediately complained abouts its disorder and intimidation to Principal Johnson. In a meeting with Plaintiffs Defendants would neither confirm nor deny whether they generated a report regarding the incident. This initial online incident and sitting through classes described above traumatized William, discouraged and chilled his speech. His mother also did not want him to participate further, and appealed to Defendants repeatedly, complaining specifically of the coercive identity revelations and the subsequent hostile environment Defendants were fostering. [Clark Complaint. ¶ 41]

### D.   ACCOMMODATION SOUGHT; RETALIATION GIVEN

Defendants informed William that he must return to and complete the "Sociology of Change" class, or he would not be permitted to graduate from high school. Plaintiffs spoke with school officials on multiple occasions from September 2020 to the present to express their conscientious objection class' required identity exercises and assert their rights to abstain from participating in class sessions and assignments that were coercive, invasive and discriminatory. But the response from increasingly higher levels DPAC and DPPS officials was the same: if you don't participate in the class' sessions, you don't graduate. [Clark Complaint. ¶ 42]

In a signed letter dated September 17, 2020, Principal Johnson wrote to Gabrielle that "[a]fter reviewing the documents from Ms. Bass, the course syllabus, and hearing your concerns, I have determined that the Sociology of Change course is still a valuable learning experience for William (and his classmates) and will continue to be a required course for

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

graduation."30. [Clark Complaint. ¶ 46] Again, on October 12, 2020, Principal Johnson sent an email to Gabrielle in response to her and William's complaints about the discriminatory identity labeling, stating "I know you have disagreements with some of the information shared in the Sociology of Change course, however, as I mentioned the course is required for graduation." On the same day Gabrielle responded "William will not be attending Sociology of Change. The class violates his civil rights. Retaliation with threats to his graduating is also a violation of his civil rights. If you'd like to discuss an alternative to this class, I am available anytime." [Clark Complaint. ¶ 47]

On October 19, 2020, Principal Johnson moderated his position. He wrote that William could not go and not do the assigned work if he chooses, and fail and be ineligible for graduation. Or he could complete a "minimum" of the exercises and assignments, and then receive a grade of a C minus, the school's lowest passing grade, which might disqualify him from being considered for admission to his preferred colleges of NYU and Berkeley School of Music, but at least it would not technically count as a failing grade. Or William could participate fully in the "Sociology of Change" class, pass with flying colors and face no grade penalization. These offers forced Plaintiffs to choose between fidelity to conscience and their right to a public education. [Clark Complaint. ¶ 49]

The refusal of any reasonable accommodation to William's conscientious objection contradicts explicit public statements by DPPS and Superintendent Trivers, who both have encouraged students "to use their voice to stand up for what is right, even if that means pushing back against a school policy, occupying a cafeteria, or staging a walkout" in online posts on March 30, 2020 from the school's corporate and Superintendent Triver's personal Twitter.com social media accounts, and in staff training materials annexed to this motion.[31] [Clark Complaint. ¶ 52] Offering no reasonable accommodation, Defendants followed

---

[30] *See* ECF No. 1, Exhibit E.

[31] Bentheim Declaration, ¶ 18

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

through on their threats of retaliation and gave William a D minus for the "Sociology of Change" class, which according to DPPS official policy is a failing grade. The assignment of a D- grade for the "Sociology of Change" class taught and graded by Ms. Bass is a contravention of DPAC's official school handbook. According to the DPAC handbook, "Democracy Prep does not give Ds. We are aware that the lowest grade most colleges and universities will accept for entry is a C-. Because our mission is to send every DPPS scholar to the best colleges and universities, we align our grading practices with these standards."[32] [Clark Complaint. ¶ 53]

As a high school senior, William is now at work on his applications for colleges. He has to submit his grades as part of this process. He also is plying away at his other DPAC classes, despite the fear and loss of trust of in school officials resulting from this ordeal. William has suffered severe mental and emotional distress as a result of Defendants' actions and the hostile environment created by their official actions, all of which has negatively impacted his academic performance, personal relationships and future professional and academic prospects. He is currently receiving psychiatric therapy addressing these harms as well as the ongoing harassment and discrimination that is being inflicted on him by Defendants under the guise of "civics." William is at present living in fear of Defendants and reasonably anticipates further retaliation. His fears have been confirmed. Upon information and belief Defendants again blatantly retaliated against Plaintiffs and suspended William on December 16, 2020, falsely accusing him of "racism" to preempt any further self-assertion from Plaintiffs. [Clark Complaint. ¶ 54]

Gabrielle is also personally suffering from the shock, anxiety, and guilt associated with having entrusted her son to adult custodians who have set upon "unlearning" the Judeo-Christian values she imparted to her son, and from exposing him to derogatory labeling and discrimination and retaliation on the basis of his perceived race, sexuality and gender. She has

---

[32] *See* ECF No. 1, Exhibit C.

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

suffered severe emotional distress as a result and is now suffering regular heart palpitations, weight gain and insomnia. She has watched helplessly as Defendants doubled down again and again on their coercive and inconsistent policy towards her son, threatening his graduation and academic and professional future. [Clark Complaint. ¶ 55]

### E.   RACISM AS BUSINESS MODEL

Defendant DPAC is in a precarious financial situation that is aggravated by its charter management organization, DPPS. DPPS appears to be drawing public funds allocated by the State of Nevada to DPAC and removing those funds to the New York City-based management organization.[33] The only recent year when DPAC and DPPS were not running a deficit appears to have been 2020 because of the millions of dollars in forgivable small business loans DPAP/DPAC applied for under the federal Payroll Protection Program of the CARES Act and received, exploiting a loophole in COVID-19 relief measures. DPAC/DPPS appear to contradict their public claims to be entirely funded by public charter school tuition funds.[34]

## IV.   LEGAL STANDARD

A plaintiff may seek injunctive relief against unconstitutional conduct and policy. Concerning unconstitutional conduct that violates speech, the Ninth Circuit put the four-part test this way: (1) the plaintiff is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Associated Press v. Otter*, 682 F.3d 821, 823-24 (9th Cir. 2012).

Temporary restraining orders may be granted, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. The remedy is available under such conditions only if immediate and irreparable injury would result if a hearing were to be held and if the applicant certifies to the court the efforts made to give notice to the other party.

---

[33] Bentheim Declaration, ¶ 7-9

[34] *See* ECF No. 1 at ¶ 23

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

V. **ARGUMENT**

        A. **FREE SPEECH & REMEDYING RETALIATION**

William requests injunctive relief ordering Defendants to expunge the grade they conferred upon him in retaliation for his protected behavior for resisting their coercive, invasive and discriminatory curricular assignments and classroom sessions.

William will succeed on the merits of his First Amendment challenge. That Defendants repeatedly compelled his protected speech is minutely documented in the Complaint which is verified and affirmed in the declaration William.[35] That Defendant's identity confession and labeling exercises are ongoing has been conceded by Defendants themselves, and documented as a policy set in motion at the administrative level. That said, a petitioner in a First Amendment case must make a showing as to all four factors and the test does not simply "collapse into the merits" in First Amendment cases. *Thalheimer v. City of San Diego,* 645 F.3d 1109, 1128 (9th Cir.2011).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). William will continue to suffer irreparable harm absent an injunction ordering Defendants to remove the failing grade they conferred on him. The failing grade contravened Defendants' own official grading policy and was racially motivated retaliation for protected behavior and stands out on his report card as a stigma as he applies to colleges.[36]

The balance of hardships weighs in Plaintiffs' favor. Defendants alter grades and coursework requirements routinely and as it suits them[37] and so they should do so now to remedy a constitutional injustice. The injunction sought by complainant is narrow: William asks that a single grade be expunged, without any further delay.

---

[35] *See* ECF No. 1; William Clark Declaration

[36] *See* ECF No. 1 at ¶ 17

[37] Tishkowitz Dec, ¶ 9; Bentheim Dec ¶ 20-22

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Lastly, public interest is served by upholding William's First Amendment rights. The inquiry into the public interest factor is largely "subsumed within [the] analysis of likelihood of success on the merits, irreparable injury, and balance of hardships." *Sanders County,* 698 F.3d at 749. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Thalheimer,* 645 F.3d at 1129 (quoting *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 974 (9th Cir.2002)). Public interest favors preliminary injunction enjoining the state from punishing school age students for resisting class programming that compels speech and violates conscience.

Plaintiff carrying the punishment of a failing civics grade in his senior year chills speech and preserves a fear based, hostile environment which is not the status quo that the court should preserve pending trial. Neither is Defendants' current remedial offer that he go back and submit to their unlawful coursework, and be subjected to their racist PowerPoint slides again, and still be penalized for loss of credit for class participation and attendance.[38]

School students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. DesMoines* (1968). A preliminary injunction preserves that First Amendment right, and also serves the public interest. See *Cox v. McLean*, 49 F. Supp. 3d 765, 773 (D. Mont. 2014). The public interest is in preserving First Amendment freedoms. The public interest favors William.

Courts have previously intervened in the face of such blatant, selective policy exclusions. In *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Supreme Court struck down a statute that generally prohibited picketing of residences and dwellings, but exempted "the peaceful picketing of a place of employment involved in a labor dispute." *Id.* at 457, 100 S.Ct. 2286. The statute plainly "accorded preferential treatment to the expression of views on one particular subject; information about labor disputes may be

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

freely disseminated, but discussion of all other issues is restricted." *Id.* at 461, 100 S.Ct. 2286; *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)

### B. COMPELLED SPEECH AS INVASION OF THE INTELLECT AND SPIRIT

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Clapper v. Amnesty Intern. USA,* 568 U.S. 398, 437 (2014). Plaintiffs respectfully request that Defendants be enjoined from conducting identity confession and labeling exercises, whether William is required to actively participate in them or not. Ms. Wall told plaintiff's counsel that Defendants would not foreswear the practice going forward, nor assure that William would not be subjected to the practice in his "Change the World" workshop class or elsewhere, and a week later Defendants counsel in writing stated William would not be required to actively participate in professing and labeling his identities if they were to happen in his "Change the World" class, or in another class.[39]

The above "concessions" are obtuse and illusory, as they still expose Plaintiff to a racially hostile environment, and is anyway temporary litigation posture meant to revert to prior policy. Plaintiffs thus request declaratory relief in the form of an order stating that it is unconstitutional compelled speech for Defendants to direct school age students to divulge sexual, gender, racial and religious identities and disabilities "if any" in a classroom only to have those identities normatively and pejoratively labeled. A public school's discretion to select its curriculum is not unfettered and "is circumscribed by the proscriptions of the First Amendment." *See Lee v. Weisman*, 505 U.S. 577, 587 (1992); *see also C.f. Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000) (holding that school policy of permitting student-led, student-initiated prayer at football games served no legitimate state interest violated the First Amendment). In *Weissman*, a public-school student and her father brought suit seeking permanent injunction to prevent inclusion of invocations and benedictions in graduation

---

[39] *See* ECF No. 1 at ¶ 51

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

ceremonies of city public schools. The United States District Court for the District of Rhode Island granted relief, which the Supreme Court ultimately affirmed. *Id.* Additionally, courts have found that prayer rituals in elementary and secondary schools, which resemble Defendants serial identity confession exercises, carry a particular risk of indirect coercion. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601; *School Dist. Abington v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844.

With regard to required civic pledges in elementary schools, there of course is the *Barnette* decision where the Supreme Court struck down a school regulation that mandated students salute the flag and recite the Pledge of Allegiance on threat of suspension. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624. As in *Barnette*, Defendants endeavor to place intimate, personal matters "within the vicissitudes of political controversy," albeit in a more extreme and divisive fashion, applying discriminatory stereotyped labels to the identities professed on command by individual school age pupils. Defendants' current position, that William simply stands by while others oblige the teachers' demands to recite their identities for labeling is unavailing. In *Weissman*, the Court found that by coercing student to stand and remain silent during giving of prayer, even though student was not required to join in message could meditate on own religion or let mind wander. *Id.*

Also in *Weissman*, the Court held that the State may not place the student dissenter in the dilemma of participating or protesting. The Court held that since adolescents are often susceptible to peer pressure, especially in matters of social convention, the State may no more use social pressure to enforce orthodoxy than it may use direct means. "The embarrassment and intrusion of the religious exercise cannot be refuted by arguing that the prayers are of a de minimis character, since that is an affront to the rabbi and those for whom the prayers have meaning, and since any intrusion was both real and a violation of the objectors' rights." *Id.*

There are heightened concerns with protecting freedom of conscience from coercive pressure in the elementary and secondary public schools. In *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) the Court held that sources of this coercive

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

power are "mandatory attendance, ... students' emulation of teachers as role models, and the children's susceptibility to peer pressure"). In William's case, attendance was mandatory. Active and full participation in identity professions and labeling was also mandatory and repeated, as Principal Johnson stated in his September 17, 2020 Letter, and again in his email. Labeling identities as "oppressor" or privileged" was both verbal, as in Barnette, and written. *See eg Frudden v. Pilling*, 742 F.3d 1199, 1204 (9th Cir. 2014) (holding "written expression" of school uniform logo compelled speech and violated students' First Amendment rights).

Even the "emulation of teachers" is vividly exhibited in William's case. Peer pressure was present, and stoked to a frenzy by Defendants, as it was officially encouraged, and even goaded as it involved intimate matters of race, sex and gender among adolescents.[40] By merely being present but not participating, William was forced to suffer humiliation and alienation, feelings made more acute by his conspicuously different racial appearance,[41] and these feelings Defendants meant to engender in order to work in participants and non-participants alike as a sort of pain cure. Indeed, in a OneTilt slide, "discomfort" is identified as a psychological status to be deliberately instilled in the participants.[42] Such premeditated discomfort and induced feelings of shame and alienation are not avoidable by simply not participating, which again is Defendants' current remedial offer, and it is one reason why William requests injunctive and declaratory relief.

### C.     HOSTILE ENVIRONMENT AND EQUAL PROTECTION

In *Barnette*, the Court remarked that the Pledge of Allegiance as a political ritual was not diminished by the First Amendment's right of children to refuse to participate, since so many do voluntarily take the pledge. The Court also acknowledged the pledge's utility in instilling solidarity and a sense of common purpose. *Barnette*, 319 US 64 (1964). However

---

[40] *See* ECF No. 1 ¶ 42

[41] *See* ECF No. 1 ¶ 41

[42] Bentheim Dec, Ex 3

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

here, as evidenced by the resistance to the school endorsed stereotypes and labeling by William and some of his fellows, it is more likely than not that Defendant's exercises would be diminished if they were not mandatory; that is to say, if students could avoid it, few would consent to the serial exercise of revealing and labeling racial, sexual and gender identities.[43]

William did try to avoid it. One reason, he did so is that the racial composition of his family is complex and sensitive, and not easily slotted into rough, pre-ordained categories that are untrue to the Clarks' lived experience. William recoiled from the exercises that trafficked in racial, sexual and gender stereotypes which objectively created a hostile environment in violation of Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the 14th Amendment. A federal court generally has broad discretion regarding an injunction pursuant to Title VI ordering the halt of unconstitutional conduct or mandating that specific actions be taken to effectuate or implement redress for individuals harmed by the unconstitutional conduct. *See eg Smith v. Young Men's Christian Ass'n of Montgomery, Inc.*, 462 F.2d 634, 636, 643 (5th Cir. 1972).

Plaintiffs are likely to prevail on the merits. Defendant's specific practice of endorsing racial stereotypes and programming mandatory identity labeling violate Title VI of the Civil Rights Act of 1964, create a hostile environment and should be enjoined. Plaintiffs' also request declaratory relief, since Defendants' stated repeatedly they intend to continue practicing the exercises on school students, even with William in the classroom, or down the hall.[44] Racial harassment need not be directed at the complainant in order to create a hostile educational environment. 59 Fed.Reg. 11449–50. The urgency of the problem is compounded by the school being unsafe, understaffed, intentionally unpoliced, and racially hostile generally.

---

[44] *See* ECF No. 1 at ¶ 51,52

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Under 42 U.S.C. § 2000d, "[n]o person...shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* To state a claim for a violation of this section, a plaintiff must plead "(1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994).

Defendants receive federal funds. These Defendants designed and implement a curriculum program that orchestrates racial harassment and is designed to treat students disparately, instilling discomfort in some but not others, according to their race and color. Courts have found such exercises can create hostile environments. *Underwood v. Northport Health Servs., Inc., 57 F. Supp. 2d 1289, 1303 (M.D. Ala. 1999)* (finding "baseless accusations of racism" made against employee are racial harassment that contributes to a racially hostile work environment in violation of the 1964 Civil Rights Act.)

The Department of Education defines a "racially hostile environment" as one in which racial harassment is "severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by the recipient." Racial animus is credibly and specifically attributed to individual Defendants in the teacher declarations annexed hereto. The declarations also specifically described instances where Defendants' personal racial prejudices are magnified into school policy and introduced into curriculum.[45]

Defendant's curriculum programming interferes with William's ability to participate in and benefit from his public education. He could not tolerate the class, because it was racist. He had to leave the class, so Defendants punished him. Defendants obtusely kept telling him to take it on the chin and go back to the class. Plaintiff's poor performance in the class was the result of the racial hostility and harassment baked into it, and this affected Plaintiff

---

[45] Bentheim Dec, ¶ 4,17,18; Tishkowitz ¶ 10.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

disparately on account of his generally perceived race and color. Defendants further retaliated against him with a grade their handbook says they do not offer as a matter of policy, and this was racially motivated retaliation.

In order, to state a claim for retaliation, a plaintiff must show: "(1) that she engaged in protected activity"; (2) that she suffered "a material adverse action"; and (3) "that a causal connection existed between the protected activity and the adverse action." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). The failing grade is an act of retaliation by Principal Johnson and all individual Defendants and should be imputed to the DPAC School Board who was included in and over saw the ordeal for months.  The overall grade also included specific deductions for particular unlawful exercises that William refused to complete.[46] As an anti-retaliation measure, the grade should be expunged and William afforded the opportunity to earn the missed credits with another class or project.

Since Defendant's apply derogatory labels to some racial, sexual, and gender identities, but not to others, their mandatory exercises are per se discriminatory and their pedagogical or civic utility is prima facie dubious. Plaintiffs are mindful that the heightened concern regarding coercing school students is balanced to a great degree by the broad discretion of a school board to select its public-school curriculum. *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The Supreme Court has emphasized, though, that courts should inject themselves in a controversy regarding the daily operation of a school system if basic constitutional values are "directly and sharply implicate[d]." *Id.* at 104–05, 89 S.Ct. 266 (1963); see also *California Parents for Equalization of Educ. Materials v. Noonan*, 600 F. Supp. 2d 1088, 1116 (E.D. Cal. 2009).

A School Board's "broad discretion" in selecting its curriculum is vitiated further by the fact that Defendants do not actually have a board of directors in any meaningful sense. Defendant's coercive, racist "civics" programming was prepared in New York City with the

---

[46] *See* ECF No. 1 at ¶ 29

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

help of well-paid, for-profit contractors and then placed in the hands of teachers around the country, including DPAC in Nevada. These teachers are described by Defendants as "public employees." Defendant School Board and SPCSA were deliberately indifferent to these developments.

Even if the curriculum programming at issue was examined, deliberated upon and approved by a fully staffed, independent and deliberative school board, it "directly and sharply implicated" constitutional rights, namely it discriminated, harassed and compelled protected speech, while serving no legitimate state interest. *See Fisher v. Fairbanks North Star Borough School Dist.*, 704 P.2d 213, 217, 27 Ed. Law Rep. 329 (Alaska 1985) (stating that while school board's authority over classroom materials is "very broad," board may not design curriculum to impose racial bias or political preference).

### D. TITLE IX HOSTILE ENVIRONMENT AND STEREOTYPE HARASSMENT

Title VI is the model for several subsequent statutes that prohibit discrimination on other grounds in federally assisted programs or activities, including Title IX (discrimination in education programs prohibited on the basis of sex). *See U.S. Department of Transportation v. Paralyzed Veterans*, 477 U.S. 597, 600 n.4 (1986). Accordingly, courts have "relied on case law interpreting Title VI as generally applicable to later statutes." *Id.*

William will prevail on the merits for his Title IX claims. Defendants applied their coercive curriculum programming to sex and gender just as they did to race and color. William would have been consenting to the "oppressor" and "privilege" in professing his sexuality, and Defendants stereotyped and made baseless accusations of sexism: "interpersonal sexism is what men do to women."[47]  Defendants applied pejorative moral attributes to individual students on the basis of sex and gender, just as they did with race, and created a coercive program in which students were compelled to confess their complicity for these inherent failings.

---

[47] *See* ECF No. 1 at ¶ 33.

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Defendants solicit and label students' sexual and gender identities. Determining and coming to terms with gender identity, especially for adolescents, is an intimate, confusing and profoundly fraught negotiation with one's inner self. Defendants' curriculum cheapens that intimate process, requiring students to "Label and identify!" gender for "10 points.[48] Perpetuating such a program is not in the public interest because it is cruel, and serves no legitimate state purpose.

Just as was the case with race and color, some genders and sexualities fared better than others in Defendants' exercises. To William's male sexual identity Defendants applied an "oppressor" label, and William was instructed and required to assign this label to himself. So to with "privilege," which again Defendants define prescriptively. As was the case with race, certain character failings were only present in one sex and gender, but in another: "interpersonal sexism is what men do to women" Defendants carrying on with such a program is not a status quo that should be preserved. Courts have found that sex stereotyping--that is, a person's nonconformity to social or other expectations of that person's gender--constitutes impermissible sex discrimination with respect to Title VII. "In the specific context of sex stereotyping, an employer who acts on the basis of a [stereotyped gender belief] . . . has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, 109 S. Ct. 1775, 1790–91, 104 L. Ed. 2d 268 (1989). In the instant educational environment, Defendants acted on gender and sex stereotypes, serially applying them to students including William, and then took further action by grading the ordeals.

Further promotion and implementation of such coercive exercises should be enjoined as it expresses hostility in an educational environment that William still inhabits. Plaintiffs respectfully request that the official application of normative sex and race stereotypes like "privileged" and "oppressor" onto individual students and the required identity exercises as

---

[48] *See* ECF No. 1 at ¶ 29

applied to race, gender, and sex be declared sexual and racial harassment, promotive of a hostile environment, and violations of Title VI and IX.

## VI.    **CONCLUSION**

Plaintiffs respectfully request an emergency preliminary order directing Defendants to expunge the failing first Trimester "Sociology of Change" grade and to accommodate William Clark by permitting him to enroll in another class or project. For an order that Principal Johnson, as he did last November, personally deliver to Plaintiffs the report card, corrected and scrubbed of stigma. For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants its officials, agents, employees, and all persons acting in concert or participating with them are prohibited from conducting coercive, graded identity confession and labeling exercises and such exercises declared harassment, a hostile environment and unconstitutional as well as a declaration that Defendants compelled speech and retaliated against William, violating the First Amendment to the Constitution of the United States, 42 U.S.C. §§ 1983, the Equal Protection Clause, Title VI of the Civil Rights Act and Title IX.

Dated this 15th day of January, 2021.

MARQUIS AURBACH COFFING

By  */s/Brian R. Hardy*
    Brian R. Hardy, Esq.
    Nevada Bar No. 10068
    10001 Park Run Drive
    Las Vegas, Nevada 89145

    Jonathan O'Brien, NYB No. 5043369
    (Pending Admission Pro Hac Vice)
    Law Office of Jonathan O'Brien
    43 W. 43rd St, Suite 002
    New York, NY 10036

    *Attorneys for Plaintiffs William Clark and Gabrielle Clark*

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM

## CERTIFICATE OF MAILING

I hereby certify that on the 15th day of January, 2021, I served a copy of the foregoing **EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** upon each of the parties by depositing a copy of the same in a sealed envelope in the United States Mail, Las Vegas, Nevada, First-Class Postage fully prepaid, and addressed to:

State Public Charter School Authority
2080 E. Flamingo Rd. Suite 230
Las Vegas, NV, 89119
Rebecca.Feiden@spcsa.nv.gov
Rherrick@spcsa.nv.gov
*Attorney for Defendant SPCSA*

Alan E. Schoenfeld | WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007 USA
+1 212 937 7294 (t)
+1 212 230 8888 (f)
alan.schoenfeld@wilmerhale.com
*Attorneys for Democracy Prep Defendants*

and that there is a regular communication by mail between the place of mailing and the place(s) so addressed.

*/s/J. Case*
an employee of Marquis Aurbach Coffing

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:16325-001 4251116_2 1/15/2021 4:17 PM