MARK E. FERRARIO, ESQ.
Nevada Bar No. 1625
KARA B. HENDRICKS, ESQ.
Nevada Bar No. 7743
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: ferrariom@gtlaw.com
       hendricksk@gtlaw.com

*Attorneys for Defendants Democracy Prep Public Schools, Democracy Prep Public Schools, Inc., Democracy Prep at the Agassi Campus, Democracy Prep Nevada LLC, School Board of Democracy Prep at the Agassi Campus, Natasha Trivers, Adam Johnson, Kathryn Bass, Joseph Morgan, PhD, and Kimberly Wall*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GABRIELLE CLARK, individually and as parent and guardian of WILLIAM CLARK, and WILLIAM CLARK, individually, | CASE NO.: 2:20-cv-02324-APG-VCF |
| Plaintiffs, | |
| vs. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |
| STATE PUBLIC CHARTER SCHOOL AUTHORITY, DEMOCRACY PREP PUBLIC SCHOOLS, DEMOCRACY PREP PUBLIC SCHOOLS, INC., DEMOCRACY PREP at the AGASSI CAMPUS, DEMOCRACY PREP NEVADA LLC, SCHOOL BOARD of Democracy Prep at the Agassi Campus, NATASHA TRIVERS, individually and in her official capacity as Superintendent and CEO, ADAM JOHNSON, individually and in his official capacity as Executive Director and Principal, KATHRYN BASS, individually and in her capacity as Teacher, JOSEPH MORGAN, individually and in his official capacity as Board Chair, KIMBERLY WALL, individually and in her capacity as assistant superintendent, and John & Jane Does 1-20, | |
| Defendants. | |

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Democracy Prep Public Schools, Democracy Prep Public Schools, Inc., Democracy Prep at the Agassi Campus, Democracy Prep Nevada LLC, School Board of Democracy Prep at the Agassi Campus, Natasha Trivers, Adam Johnson, Kathryn Bass, Joseph Morgan, PhD, and Kimberly Wall ("Defendants") by and through its attorneys of record, the law firms of GREENBERG TRAURIG, LLP, and WILMER CUTLER PICKERING HALE AND DORR LLP, file this Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Response").

This Response is based upon the pleadings on file herein, the attached Memorandum of Points and Authorities, the Declaration of Adam Johnson and the exhibits thereto, and any oral argument the Court may permit at the hearing of this matter.

DATED this 8th day of February, 2021.

**GREENBERG TRAURIG, LLP**

        */s/ Kara B. Hendricks*
MARK E. FERRARIO, ESQ.
Nevada Bar No. 1625
KARA B. HENDRICKS, ESQ.
Nevada Bar No. 7743
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

*Attorneys for Defendants Democracy Prep Public Schools, Democracy Prep Public Schools, Inc., Democracy Prep at the Agassi Campus, Democracy Prep Nevada LLC, School Board of Democracy Prep at the Agassi Campus, Natasha Trivers, Adam Johnson, Kathryn Bass, Joseph Morgan, PhD, and Kimberly Wall*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

      A.    Democracy Prep's Mission And Curriculum............................................ 3

      B.    Clark Refuses To Attend Class Or Do His Assignments........................ 5

      C.    ██████████████████████████████ ............................ 9

      D.    This Lawsuit And Clark's Motion For A Preliminary Injunction ................. 10

ARGUMENT ............................................................................................................ 10

I.    Clark's Mother Has No Standing To Sue ...................................................... 11

II.    The Law And Facts Do Not Clearly Favor Clark's Claims........................... 12

      A.    The Law Does Not Clearly Favor Clark's Compelled-Speech Claim.......... 12

      B.    The Law Does Not Clearly Favor The First Amendment Retaliation Claim ............. 17

      C.    The Law Does Not Clearly Favor Clark's Discrimination Claims.............. 20

III.    Clark Otherwise Fails To Justify The Extraordinary Relief That He Seeks ......... 22

CONCLUSION......................................................................................................... 24

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

ii

# TABLE OF AUTHORITIES

Page

**Cases**

*Albright v. Oliver,*
510 U.S. 266 (1994)..................................................................................................... 12

*Alsup v. Northwest Shoals Community College,*
2016 WL 5253212 (N.D. Ala. Sept. 22, 2016)......................................................... 23

*American Communications Association, C.I.O. v. Douds,*
339 U.S. 382 (1950)..................................................................................................... 13

*Arizona Students' Association v. Arizona Board of Regents,*
824 F.3d 858 (9th Cir. 2016) ..................................................................................... 19

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) ................................................................................. 22

*Board of Regents of University of Wisconsin System v. Southworth,*
529 U.S. 217 (2000)..................................................................................................... 16

*Brown v. Li,*
308 F.3d 939 (9th Cir. 2002) ........................................................................... 16, 22, 23

*C.N. v. Ridgewood Board of Education,*
430 F.3d 159 (3d Cir. 2005)............................................................................ 13, 14, 16

*California Parents for Equalization of Education Materials v. Torlakson,*
267 F. Supp. 3d 1218 (N.D. Cal. 2017), *aff'd,* 973 F.3d 1010 (9th Cir. 2020) .............. 22

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019) ..................................................................................... 23

*Erik V. v. Causby,*
977 F. Supp. 384 (E.D.N.C. 1997)............................................................................. 24

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) ............................................................................... 10, 11

*Hammond v. Auburn University,*
669 F. Supp. 1555 (M.D. Ala. 1987), *aff'd,* 858 F.2d 744 (11th Cir. 1988)................... 23

*Harris v. Morris,*
2017 WL 8776683 (6th Cir. Oct. 26, 2017).............................................................. 23

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

iii

*Hazelwood School District v. Kuhlmeier*,
    484 U.S. 260 (1988)............................................................................................................13

*Head v. Board of Trustees of California State University*,
    2006 WL 2355209 (N.D. Cal. Aug. 14, 2006),
    *aff'd*, 315 F. App'x 7 (9th Cir. 2008)................................................................................17

*Hearn v. United States*,
    2020 U.S. Dist. LEXIS 59871 ...........................................................................................23

*Innovation Law Lab v. Nielsen*,
    310 F. Supp. 3d 1150 (D. Or. 2018) ..................................................................................11

*Keeton v. Anderson-Wiley*,
    664 F.3d 865 (11th Cir. 2001) ......................................................................................16, 17

*Keyser v. Sacramento City Unified School District*,
    265 F.3d 741 (9th Cir. 2001) ..............................................................................................20

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019) ..............................................................................................18

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)............................................................................................................12

*Laird v. Tatum*,
    408 U.S. 1 (1972)................................................................................................................13

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999)............................................................................................................21

*Lee v. Board of Trustees of the California State University, Fullerton*,
    2015 WL 4272752 (C.D. Cal. July 14, 2015) ...................................................................21

*Lindner v. Occidental College*,
    2020 WL 7350212 (C.D. Cal. Dec. 11, 2020) ..................................................................12

*Maffeo v. Nevada*,
    2010 WL 4136985 (D. Nev. Oct. 19, 2010),
    *aff'd*, 461 F. App'x 629 (9th Cir. 2011)............................................................................23

*Major v. Office of Superintendent of Schools*,
    2008 WL 5119153 (W.D. Wash. Dec. 4, 2008) ...............................................................12

*Marin v. Eidgahy*,
    2012 WL 928250 (S.D. Cal. Mar. 19, 2012) ....................................................................22

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ..............................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

iv

*Mauriello v. University of Medicine & Dentistry of New Jersey*,
   781 F.2d 46 (3d Cir. 1986) ............................................................................. 23

*McCann v. University at Buffalo*,
   2016 U.S. Dist. LEXIS 98994 ........................................................................ 23

*Monteiro v. Tempe Union High School District*,
   158 F.3d 1022 (9th Cir. 1998) ......................................................... 17, 21, 22

*Nkwuo v. Angel*,
   693 F. App'x 696 (9th Cir. 2017) ................................................................... 21

*United States v. Ramsey*,
   431 U.S. 606 (1977) .................................................................................. 13, 14

*Roman v. Wolf*,
   829 F. App'x 165 (9th Cir. 2020) ..................................................................... 2

*Rothberg v. Law School Admissions Council*,
   102 F. App'x 122 (10th Cir. 2004) ................................................................. 24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) .......................................................................................... 13

*Senate of the State of California v. Mosbacher*,
   968 F.2d 974 (9th Cir. 1992) .......................................................................... 24

*Davison ex rel. Sims v. Santa Barbara High School District*,
   48 F. Supp. 2d 1225 (C.D. Cal. 1998) ........................................................... 21

*South Bay United Pentecostal Church v. Newsom*,
   __ F.3d __, 2021 WL 222814 (9th Cir. Jan. 22, 2021) ..................... 2, 10, 11

*Stanley v. University of Southern California*,
   13 F.3d 1313 (9th Cir. 1994) ............................................................................ 2

*T.V. v. Sacramento City Unified School District*,
   2016 WL 397604 (E.D. Cal. Feb. 2, 2016) .................................................... 21

*Taiebat v. Scialabba*,
   2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ................................................. 24

*Todd v. Ackley*,
   551 F. App'x 906 (9th Cir. 2014) ................................................................... 12

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ........................................................................................ 15

v

*W.C. v. Rowland Unified School District*,
  2017 WL 11509987 (C.D. Cal. June 15, 2017) ...................................................................17

*Williams v. City University of New York, Brooklyn College*,
  2011 WL 6934755 (E.D.N.Y. Dec. 30, 2011) .....................................................................22

*Wood v. Arnold*,
  915 F.3d 308 (4th Cir. 2019) ..............................................................................................16

*Wooley v. Maynard*,
  430 U.S. 705 (1977).............................................................................................................15

*Working Washington v. Central Puget Sound Regional Transit Authority*,
  533 F. App'x 716 (9th Cir. 2013) ........................................................................................11

**Statutes**

20 U.S.C. § 1681 et seq...........................................................................................................10

42 U.S.C. § 1983 .....................................................................................................................12

42 U.S.C. § 2000d et seq..........................................................................................................10

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Democracy Prep Public Schools operates a network of 21 high-performing, open enrollment public charter schools in Baton Rouge, Las Vegas, Camden, New York City, and San Antonio.  Its mission, advertised on its website and coursing through its veins, is "to educate responsible citizen-scholars for success in the college of their choice and a life of active citizenship."  To that end, seniors enroll in a civics course called Sociology of Change, which explores theories of social change through sociological models and case studies.  Students engage with social theory and apply it to examples of social change like the ALS Ice Bucket Challenge, the Egyptian Revolution, and the BlackLivesMatter Movement.  This coursework leads to students' capstone Change the World project—an opportunity to put lessons about activism and community engagement into practice.

William Clark is a senior at Democracy Prep at the Agassi Campus in Las Vegas ("Democracy Prep" or "DPAC").  Like all Democracy Prep students, Clark must complete Sociology of Change to graduate.  In September 2020, Clark informed his teacher that he would "not be attending your class until further notice."  Clark explained that his mother is "conservative and has been for her entire life," and was "very upset with what she saw and claims your class to be rather subjective-based," including "the lesson in which you labeled liberals, conservatives, etc."  In his mother's words, Clark "will not be participating in any type of Critical Race Theory class," which she deemed "a violation of his civil rights."  Through their lawyer, the Clarks objected to disclosing "his race, gender, sex, or religious identity" asserting that activity also violated William's rights—even though Democracy Prep assured that "William is not required to reveal [that information]."

Based on that complaint, Clark stopped attending the class for the remainder of the trimester; he received a D- grade for the course.  Ultimately, Democracy Prep—while standing behind its curriculum—agreed to provide Clark with an accommodation: The school would change his first trimester grade and allow him to receive full credit for any missed assignments from the last trimester so long as he attended class and completed the assignments.  To the extent Clark had concerns about the course instructor—the only faculty member who teaches the class—Democracy Prep permitted Clark to select a trusted mentor to collaborate with the teacher to "help ensure his success in the course."

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Instead, Clark filed suit and an emergency motion for a temporary restraining order and preliminary injunction. He demands that the Court order Democracy Prep to expunge his first trimester grade—and further that principal Adam Johnson "personally deliver … the report card, corrected and scrubbed of stigma"—and permit Clark to enroll in another course as a substitute for Sociology of Change. Clark further demands that the Court enjoin Democracy Prep from "conducting coercive, graded identity confession and labeling exercises."

Clark's motion should be denied. The point of a temporary restraining order or a preliminary injunction is to maintain the status quo during the pendency of the litigation. But that is not what Clark seeks here. To the contrary, he asks this Court to eviscerate the status quo—to order Democracy Prep to change his grade, reissue his report card, dispense with a graduation requirement, and bowdlerize its curriculum of elements Clark dislikes.

To obtain the mandatory preliminary injunction he seeks, Clark must first show a "clear likelihood of success on the merits." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1316 (9th Cir. 1994). He cannot. Ninth Circuit precedent makes clear that public schools have broad discretion to formulate their curriculum and that they can engage their students without running afoul of the First Amendment or any other constitutional provision or law. Schools also must be allowed to assign grades to students fairly based on participation in a class and completion of assignments; indeed, established Ninth Circuit law provides for their right to do so.

If he could clear that first hurdle—and he cannot—Clark would then need to show that "extreme or very serious damage" would result absent an injunction. *Roman v. Wolf*, 829 F. App'x 165, 170 (9th Cir. 2020) (citation omitted). And then he would need to show that the equities favor entering the type of broad and unprecedented injunction he seeks. *See S. Bay United Pentecostal Church v. Newsom*, __ F.3d __, 2021 WL 222814, at *7 (9th Cir. Jan. 22, 2021). He cannot do that either. Clark barely explains how he is harmed, much less irreparably, by receiving the grade his non-participation warranted, and overlooks the many accommodations Democracy Prep offered. Moreover, the equities decisively cut against him. Federal courts do not act as super-school boards, directing professional educators to administer particular grades or teach courses using particular assignments or strategies.

/ / /

2

**STATEMENT OF FACTS**

A.      **Democracy Prep's Mission and Curriculum**

Democracy Prep Public Schools ("DPPS") is a charter school management organization that operates a network of 21 high-performing public charter schools in Baton Rouge, Las Vegas, Camden, New York City, and San Antonio, including DPAC.  *See About Democracy Prep*, Democracy Prep Public Schools, https://democracyprep.org/about/ (last visited Feb. 6, 2021); Ex. 1, Feb. 6, 2021 Declaration of Adam Johnson ("Johnson Decl.") ¶ 4.  Its mission is "to educate responsible citizen-scholars for success in the college of their choice and a life of active citizenship."  *About Democracy Prep*, Democracy Prep Public Schools, https://democracyprep.org/about/ (last visited Feb. 6, 2021). As an integral part of this mission, DPPS aims to foster "Authentic Civic Engagement" in its students; that is, it seeks to "prepar[e] scholars to be active citizens and leaders in our democracy."  *Id.*  Students are offered "civic initiatives, community engagement, [and] speech and debate" so they can "acquire the knowledge, skills, and attitude to change the world."  *Id.*

To put these ideals into practice, DPAC requires all students to participate in a standardized civics curriculum, which consists of a year-long course titled Sociology of Change, paired with a project-based course titled Change the World.  Compl. ¶ 28.  These two courses are at the heart of DPPS's pedagogical model: They aim to encourage students to engage with the community, and to learn, reflect, and discuss complex ideas about social theory and social change.  *See* Johnson Decl. ¶¶ 6-7.  To that end, students in Sociology of Change engage with theoretical ideas and apply those ideas to examples of social movements like the ALS Ice Bucket Challenge, the Egyptian Revolution, and the BlackLivesMatter Movement.  *Id.* ¶ 7.  As Adam Johnson, Principal and Executive Director of DPAC, explained in an email to Clark:

> [O]ur scholars' ability to understand others' point of view and evolve their thinking is a critical skill to develop, and we hope that by scholars in the Sociology of Change course continuing to engage with one another on a variety of topics where scholars may have varying opinions, our scholars will be able to better engage in this discourse as they build coalitions in their communities.
>
> At Democracy Prep our mission is to educate responsible citizen scholars for success in the college of their choice and a life of active citizenship.  In short, we expect scholars to "Work Hard. Go to College.  [And] Change the World!"  In order to prepare scholars

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

3

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

for those tasks, we need to provide experiences on campus that allow scholars to practice
the necessary skills to achieve that lofty goal.  The Change the World project is an
opportunity for our seniors to demonstrate their mastery of the required skills of problem
identification, solution design, coalition building, and project execution.  The Sociology
of Change course is intrinsic to their success in completing the project.  In the class they
are exposed to social change and social movement theory.  Their analysis of social
change movements and theory is integral to their growth and execution of their projects.

*Id.* ¶ 13.  Hand in hand with the Sociology of Change course, the Change the World Project "introduces a process for lifetime learning," and gives students the opportunity to "demonstrate accumulated skills" that "are the very skills and abilities" needed to "make the transition from school to work / college / military service."  Compl., Ex. D (ECF No. 1-5) ("Syllabus") at 1-2.  The two courses are intertwined. As the course syllabus explains:

> In [the Sociology of Change] class you will be exposed to social change and social
> movement theory.  We will use case studies to learn and apply social change theory to
> both modern and historical change movements.  This analysis will be instrumental in
> the development and execution of your Change the World Project.

*Id.* at 2.  The syllabus also explains that the course uses a version of the Socratic method to spark discussion—the teacher "may initially jump in to lead the discussion, get the discussion back on track, and / or pose questions," but that the ultimate goal is for students to manage the discussion themselves and for the teacher to "participate as a member of the group."  Syllabus at 5.  "Scholars are encouraged and expected to share their own views on the topics discussed in the Sociology of Change, including when those views differ from those of the teacher of other students."  Johnson Decl. ¶ 8.  Teacher Kathryn Bass made these expectations clear at the beginning of the course, informing the scholars that the class "heavily depends on discussion" and that students should be "Open minded" and "Considerate and supportive of other scholars."  Johnson Decl., Ex. A ("Aug. 18, 2020 Class Slides") at 14. Crucially, class slides reminded students that "Every voice is heard and appreciated" and that class is a "Learning environment—we cannot get better if we do not learn and have difficult conversations!" *Id.*  The introductory course slides also provide expectations for Socratic seminar and debate class sessions, *id.* at 16-17, and set an expectation for students to learn and discuss "both sides" of a "social movement topic," e.g., "#BlackLivesMatter versus #Blue or #AllLivesMatter," *id.* at 17.

/ / /

4

**B.    Clark Refuses to Attend Class or Do His Assignments**

William Clark is a twelfth-grade student at DPAC.  Compl. ¶ 8.  Clark enrolled in Sociology of Change and Change the World, both taught by Kathryn Bass, in August 2020.  Compl. ¶ 28.  The course began with an exploration of how identity can form the basis for social movements; the first lessons were accordingly about understanding and exploring students' identities and how identities can form the basis for social movements.  *See* Johnson Decl., Ex. B ("Aug. 19, 2020 Class Slides"); *see also* Compl., Ex. A (ECF No. 1-2) ("Course Materials") at 17.  Other course materials provided context for students, including the ways that prejudices, when paired with power, operate in systematic oppression of certain groups of people (*e.g.*, racism or sexism).  Course Materials at 4-5, 8, 11.  At several points, the class materials stressed that such oppression "[d]oes not have to be intentional," but can be an unintentional byproduct of a prejudice that individuals may not even be aware exists.  *Id.* at 5, 11.  And the materials propose one solution: students should aim to "[u]ndo and unlearn" their "beliefs, attitudes, + behaviors that stem from oppression."  *Id.* at 36.  Courses slides also describe the relationship between race and ethnicity and systemic factors like wages and incarceration, *id.* at 7, 13, and opine that knowing your identity can be important to, among other things, "Understand your relationship to institutions and society in general."  *Id.* at 16; Aug. 19, 2020 Class Slides at 15.

During the first week of school, students in Sociology of Change were asked to describe their own individual identities on a private Google Doc as "an independent reflection exercise."  Course Materials at 35; Aug. 19, 2020 Class Slides at 8.  The instructions emphasized: "This list is private!" and "no one else will see this."  *Id.*  The teacher, Kathryn Bass, shared her own identities, some of which she labeled as "privilege" and some of which she labeled as "oppressive," to demonstrate the self-reflection that the exercise hoped to motivate.  Course Materials at 18; Aug. 19, 2020 Class Slides at 11.  Students then broke into groups to discuss the reflection exercise—during which the course materials made clear "You DO NOT have to share your identities!" and that students should "Only share if you feel comfortable and safe enough to do so."  Course Materials at 23; Aug. 19, 2020 Class Slides at 12.  The lesson provided discussion topics to spark conversation about the exercise and tie it back to the purpose of the course: "How did this activity make you feel?"; "Did you learn anything about yourself?"; "Were you surprised with the amount of privilege or oppression that you have

5

attached to your identities?"; "Why do you think it is important to learn about your identities?"; and "How can identities connect to social movements?" *Id.*

On September 14, when he was supposed to be attending Sociology of Change, Clark instead wrote the following email to Ms. Bass:

> I know I should be in your class right now, but I have left due to reasons regarding the lesson in which you labeled liberals, conservatives, etc. I provided my mother insight on what your class was like since she was curious about it. She is in fact conservative and has been for her entire life. She is very upset with what she saw and claims your class to be rather subjective-based. So with that being said, me and my mother have come to the agreement that I will not be attending your class until further notice.

Johnson Decl., Ex. C.[1]

Ms. Bass forwarded the email to Mr. Johnson, who arranged a meeting with Clark, his mother Gabrielle Clark, and Ms. Bass for the next day. Johnson Decl., Ex. C; Johnson Decl. ¶ 11. During that meeting, Mr. Johnson and Ms. Bass "discussed the merits of our curriculum and how Democracy Prep welcomes vibrant discussion (from all viewpoints) during class and encourages scholars to respectfully disagree with one another and the teacher." Johnson Decl. ¶ 11. After that meeting, Mr. Johnson sent Clark a follow-up email. Mr. Johnson wrote, "I want to make sure you know that I think it is critically important to understand people's perspectives and understand how to best support them while working within the framework and value system of our school." Johnson Decl., Ex. D (Sept. 16, 2020 email from Johnson to Clark). Mr. Johnson explained that he "want[ed] to make sure a few things happen from here," including that he would "work with Ms. Bass to review her materials to determine what, if anything, needs editing" and that Clark should contact him if he believed Ms. Bass had treated him unfairly—and contact the assistant superintendent (whose email he provided) if Clark believed Mr. Johnson had treated him unfairly. *Id.* He concluded, "Ultimately, I want you to be in a school where you believe your opinions are valued, you feel safe, and you are welcomed as a scholar and human. If we are not living up to those standards, I need to reevaluate my school environment. … I will be back in touch with next steps about your request for removal from the course." *Id.*

---

[1] The course materials define "liberal" as "open to political or social changes and reforms associated with either classical or modern liberalism" and "conservative" as "a person who favors maintenance of the status quo or reversion to some earlier status." Course Materials at 45.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

Two days later, Mr. Johnson wrote to Gabrielle Clark with the school's decision not to permit Clark to opt out of the mandatory Sociology of Change course requirement.  Mr. Johnson explained that "the Sociology of Change Course is still a valuable learning experience for William (and his classmates) and will continue to be a required course for his graduation."  Johnson Decl., Ex. E (Sept. 18, 2020 email from Johnson to Gabrielle Clark).  Mr. Johnson emphasized that the school "welcome[s] civil academic and social discourse," and that students' "ability to understand others' point of view and evolve their thinking is a critical skill to develop" along with their ability "to engage with one another on a variety of topics where scholars may have varying opinions."  *Id.*  And he reiterated that "[t]he Sociology of Change course is intrinsic to [students'] success in completing" their Change the World projects, which are "an opportunity for our seniors to demonstrate their mastery of the required skills of problem identification, solution design, coalition building, and project execution."  *Id.*  For these reasons, DPAC "continue[d] to stand behind the Change the World Project and the associated Sociology of Change course."  *Id.*  Mr. Johnson concluded with another offer "to further discuss how we can ensure we provide a safe and welcoming environment for William and his classmates."  *Id.*

Clark, however, did not return to class or resume his coursework.  After two more weeks of absences, Ms. Bass emailed Clark "to reach out and touch base with you because I noticed that you have not been showing up to class."  Johnson Decl., Ex. F at 2 (Oct. 2, 2020 email from Bass to Clark).  Ms. Bass expressed that she "want[ed] to make sure we can push forward in class together and make sure you finish out your senior year strong."  *Id.*  She also "reinforce[d] that my classroom is a safe space where any and all thoughts and opinions are respected, encouraged and appreciated" and that she "look[ed] forward to hearing from you so we can begin to communicate the best way to move forward."  *Id.*  Another week of absences passed.  Mr. Johnson then emailed Clark, writing, "I have spoken to Ms. Bass about your course attendance and she let me know that you have not attended class since mid-September and have not completed any work."  Johnson Decl., Ex. F at 2 (Oct. 12, 2020 email from Johnson to William & Gabrielle Clark).  He acknowledged, "I know you have disagreements with some of the information shared in the Sociology of Change course," but implored Clark to remember that "the course is required for graduation," "[y]ou have worked incredibly hard over the past four years to achieve your goal of HS graduation and college acceptance, and we all want to see you be able to

successfully achieve that goal." *Id.* He asked, in bold font, "Can you please reply to this message and let me know a few days and times you are able to talk so we can discuss next steps for you to complete the Sociology of Change course and remaining on the path towards graduation?" *Id.*

Clark's mother responded: "William will not be attending Sociology of Change. The class violates his civil rights. Retaliation with threats to his graduating is also a violation of his civil rights. If you'd like to discuss an alternative to this class, I am available anytime. If not, we will pursue legal action." Johnson Decl., Ex. F at 1 (Oct. 12, 2020 email from Gabrielle Clark to Johnson & Bass).

Mr. Johnson responded, first emphasizing that "I want to assure you there is not and will be no retaliation against William," but rather "our school is a safe place for all scholars and I want William to share in that experience." Johnson Decl., Ex. F at 1 (Oct. 19, 2020 email from Johnson to Gabrielle Clark). Mr. Johnson then provided Clark three options, explaining the outcome for each. One option was that "William does not participate in the Sociology of Change course," which meant he "will be missing this credit from his transcript, and as such, he will be ineligible for graduation" since it "is a required course for graduation." *Id.* Mr. Johnson attached the graduation requirements. *Id.* The second option was that Clark "can finish the Sociology of Change course doing the minimum amount of work required to pass." *Id.* And the third option, which Mr. Johnson "hope[d]" Clark would choose, was to "fully engage in the course work and discussions and provide his perspective," which "will enable other scholars to grow from his experiences and prepare [Clark] for similar discourse when he is in college next year." *Id.* Mr. Johnson concluded:

> I hope William returns to class this week so he can catch up on missed work and begin to participate in the final few weeks of the semester. All of us want William to graduate from DPAC and do so while thriving—engaging (in some way) in the Sociology of Change course is on a part of the path to his DPAC graduation.

*Id.* Clark's mother emailed again:

> William Clark will not be participating in any type of Critical Race Theory class. This includes but isn't limited to Sociology of Change. It's a direct violation of his civil rights. Mr. Adam Johnson has threatened retaliation by preventing William from graduating unless he submits to having his civil right violated. This is unacceptable. If this situation isn't remedied, legal action will be taken.

8

1    Johnson Decl., Ex. G (Oct. 19, 2020 email from Gabrielle Clark to Johnson).   The trimester ended

2    without Clark returning to class or completing any coursework.   He received a grade of D- for that

3    trimester of Sociology of Change.   Compl. ¶ 17; Johnson Decl. ¶ 19.

4          The next communication from Clark came in November from Clark's attorney in this case, who

5    requested a meeting with the school.   Johnson Decl., Ex. H (Nov. 16, 2020 email from O'Brien to

6    Wall).   The Clarks and the school met, with counsel, in November, and exchanged communications in

7    November and December.   Johnson Decl. ¶¶ 21-22.   Democracy Prep—though standing firmly by its

8    curriculum—offered Clark accommodations to obtain a passing grade in Sociology of Change and

9    graduate.   *Id.* ¶ 22.   For instance, the school would have permitted Clark to make up the work and

10   change his first trimester grade.   Johnson Decl., Ex. I (Dec. 14, 2020 email from Reid to O'Brien).

11   Democracy Prep stated that while the school "cannot remove William's grade," it was "amenable to

12   changing the grade and will allow William to receive full credit for any missed assignments from the

13   last trimester" and, "[t]o do so, William would need to attend class and commit to an action plan to

14   complete the missed assignments."   *Id.*   Democracy Prep further offered that Clark could "elect a

15   mentor from the school he trusts to collaborate with Ms. Bass and help ensure his success in the course."

16   *Id.*   In the communications, the school also reiterated: "William is not required to reveal his race,

17   gender, sex, or religious identify" in the course; "Critically, William is not required to disclose such

18   information."   *Id.*   Again, Clark refused to participate in the course in any capacity.   Johnson Decl.

19   ¶ 22.

20         **C.**



GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

9

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

██████████████████████████████████████████

████████████████ [2]

**D.    This Lawsuit And Clark's Motion For A Preliminary Injunction**

Clark and his mother filed suit on December 22, 2020, bringing claims under the First, Fifth, and Fourteenth Amendments, Title VI, 42 U.S.C. § 2000d et seq., and Title IX, 20 U.S.C. § 1681 et seq., as well as a common law breach of contract claim.  The complaint asks this Court for an emergency preliminary order directing Democracy Prep to remove Clark's failing Sociology of Change grade from his transcript and award Clark a diploma.  Compl., Prayer for Relief, at 37-38.  The complaint further requests the Court to declare Democracy Prep's civics curriculum unconstitutional, order the school to change it, and award monetary damages.  *Id.* at 38.  On January 15, 2021, Clark and his mother filed an Emergency Motion for Preliminary Injunction and Application for Temporary Restraining Order ("Mot.").  ECF Nos. 18, 19.  On January 19, 2021, this Court denied Plaintiffs' request to consider the motion on an emergency basis.  ECF No. 27.

**ARGUMENT**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *S. Bay United Pentecostal Church v. Newsom*, __ F.3d __, 2021 WL 222814, at *7 (9th Cir. Jan. 22, 2021); *see Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (a preliminary injunction is an "extraordinary remedy never awarded as of right" (citation omitted)).  "To make this showing," Clark "must demonstrate that [he] is likely to succeed on the merits, that [he] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest."  *S. Bay United Pentecostal Church*, 2021 WL 222814, at *7 (first alteration supplied). [3]

---

[2] Plaintiffs' complaint and motion papers, as well as the exhibits appended to those filings, include allegations and evidence regarding unrelated subject matter, including the DPPS's structure, DPAC's financial situation, and information about student athletics programs (among a variety of other topics).  Defendants do not agree that these allegations are accurate, but decline to address them here because they are irrelevant to the lawsuit and the present motion.

[3] "The standard for a temporary restraining order" is often identical to the standard for a preliminary injunction.  *Frontline Med. Assocs., Inc. v. Coventry Healthcare Worker's Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009).

Since Clark seeks a mandatory injunction—that is, an injunction that "orders a responsible party to take action" rather than "prohibits a party from taking action," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-879 (9th Cir. 2009)—"the already high standard for granting a TRO or preliminary injunction is further heightened," *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018). As the Ninth Circuit has explained, the burden for a mandatory injunction is "doubly demanding." *Garcia*, 786 F.3d at 740. Such relief requires a heightened burden of proof, "and is particularly disfavored." *Marlyn Nutraceuticals*, 571 F.3d at 879. Specifically, to obtain a mandatory injunction, Clark must "establish that the law and facts clearly favor [his] position, not simply that [he] is likely to succeed." *Garcia*, 786 F.3d at 740; *see also Marlyn Nutraceuticals*, 571 F.3d at 879 (mandatory injunctions "not issued in doubtful cases"); *Working Washington v. Cent. Puget Sound Reg'l Transit Auth.*, 533 F. App'x 716, 718 (9th Cir. 2013) ("Thus, mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."). And Clark must also show that "extreme or very serious damage" will result absent an injunction. *Marlyn Nutraceuticals*, 571 F.3d at 879.

Clark and his mother come nowhere near satisfying this heavy burden. At the outset, Clark's mother lacks standing to sue under—and so cannot succeed on—any cause of action asserted. As for Clark himself, the law and facts clearly *disfavor* his claims. Indeed, Ninth Circuit case law is dead against his constitutional and statutory challenges to Democracy Prep's design and execution of its curriculum. While Clark gives passing mention to irreparable harm, he fails entirely to address the balance of the equities. Having omitted any mention of these requirements, Clark necessarily fails to carry his burden with respect to them.

## I.      Clark's Mother Has No Standing To Sue

Clark's mother has not asserted any injury of her own in the complaint, the motion papers, or the accompanying declarations. The only injuries asserted are her son's. *See, e.g.*, Compl. ¶¶ 43-52. To sue for someone else's injury under the doctrine of third-party standing, there must be a "hindrance" to the third-party's ability to protect his own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). There is no hindrance to Clark's ability to protect his own interests—he is not a minor and is fully capable of asserting his rights, as proved by his presence as a plaintiff in the suit. His mother thus lacks

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

standing to sue. *See, e.g.*, *Todd v. Ackley*, 551 F. App'x 906, 906 (9th Cir. 2014) ("The district court properly dismissed Todd's claims on behalf of his now-adult son because Todd lacks standing to bring those claims."); *Lindner v. Occidental Coll.*, 2020 WL 7350212, at *5 (C.D. Cal. Dec. 11, 2020) ("Once a student reaches the age of majority, courts have routinely held that parents lack standing to bring claims against their adult children's colleges and universities."); *Major v. Office of Superintendent of Sch.*, 2008 WL 5119153, at *1 (W.D. Wash. Dec. 4, 2008) ("[T]o the extent that any of the children are adults, he has no legal standing to pursue claims on their behalf.").

## II.     The Law And Facts Do Not Clearly Favor Clark's Claims

Clark moves for a preliminary injunction on his claims alleging compelled speech and retaliation, both in violation of the First Amendment; and discrimination based on race and sex, creating a hostile educational environment.  Based on these claims, Clark asks the Court for the extraordinary mandatory injunctive relief of ordering Democracy Prep to expunge his grade, issue him a new report card, disregard its graduation requirements, and rewrite its curriculum.  That relief should be denied because the facts and law do not clearly favor him on any of those claims—on the contrary, the law clearly forecloses each of them.

### A.     The Law Does Not Clearly Favor Clark's Compelled-Speech Claim

Clark claims that Democracy Prep compelled his speech in violation of the First Amendment.[4] In particular, Clark contends that Democracy Prep "compelled [him] to make professions about his racial, sexual, gender and religious identities in verbal class exercises and in graded, written homework assignments."  Compl. ¶ 1.  That allegation—that Democracy Prep "required him to reveal his racial, sexual, gender, sexual orientation, disabilities and religious identities"—is often repeated, but it is the only compelled speech that Clark alleges.  *Id.* ¶ 29; *see also id.* ¶¶ 30, 32, 35-37; *see also* Mot. 8 (contending that during "identity confession and labeling exercises," Clark "was compelled to participate in public professions of his racial, religious, sexual, and gender identities").  Under Supreme Court precedent, the First Amendment affords educators broad discretion to set curriculum, and those

---

[4] Clark's First Amendment and other federal claims are pursued through 42 U.S.C. § 1983, the procedural vehicle for enforcing an individual's constitutional and federal statutory rights.  *See Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Any § 1983 claim requires that the named defendant participated in the alleged unconstitutional conduct.  Defendants reserve argument on the specificity of allegations against each individually, in light of Clark's inability to muster any constitutional claim out of the theories he presents.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1    decisions do not violate the First Amendment so long as the curriculum is "reasonably related to [a]

2    legitimate pedagogical concern[.]" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

3    Clark's compelled-speech claim cannot survive this standard, for at least two reasons.

4         *First*, Clark's compelled-speech claim lacks something important: *compelled* speech.  It is true,

5    of course, that "freedom of speech prohibits the government from telling people what they must say."

6    *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006).  But for speech to be

7    considered compelled, "the challenged exercise of governmental power" must be "regulatory,

8    proscriptive, or compulsory in nature."  *Laird v. Tatum*, 408 U.S. 1, 11 (1972).  In other words, "a

9    violation of the First Amendment right against compelled speech occurs only in the context of actual

10   compulsion."  *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005).  Although "indirect

11   discouragements" rather than "imprisonment, fines, injunctions or taxes" can unconstitutionally

12   compel speech under some circumstances, *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 402

13   (1950), discouragements that "may fairly be considered … only minimal" or "wholly subjective" create

14   no First Amendment concerns, *United States v. Ramsey*, 431 U.S. 606, 624 (1977).

15        By his own account, Clark's speech was not compelled.  He alleges that his teacher "requested

16   each student to 'label and identify' their gender, racial and religious identities as part of 'an independent

17   reflection' exercise."  Compl. ¶ 30.  The course materials confirm this characterization.  As an

18   "Independent Reflection," those materials instruct students: "On the Google Doc write out your own

19   individual identity … This list is private!  Please be honest, no one else will see this."  Course Materials

20   at 35; *see also id.* at 12 ("Now that you have labeled and identified your identity, time to reflect ….").

21   "[T]he next step was to 'breakout' into groups," during which—as Clark acknowledges—"[t]hose

22   students who did not 'feel comfortable or safe enough to do so' … were permitted to refrain from

23   divulging the information to other students in their group," as the teacher "assured them."  Compl. ¶ 32.

24   The course materials again confirm: "You DO NOT have to share your identities!  Only share if you

25   feel comfortable and safe enough to do so."  Course Materials at 23.

26        Given these instructions that Clark need not publicly participate in this "independent

27   reflection," there was no compulsion rising above the "minimal" or "wholly subjective" level.  *Ramsey*,

28   431 U.S. at 624.  On the contrary, Clark's complaint makes clear that he was *not* compelled to speak

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

13

("You DO NOT have to share your identities!") and that any compulsion he did feel *was* subjective. Course Materials at 23; *see also, e.g.*, Compl. ¶ 30 ("William Clark *felt that* if he had submitted to the terms of this exercise, he would have been *in effect* adopting and making public affirmations about his racial, sexual, gender identities and religious background that he believed to be false and which violated his moral convictions." (emphases added)); *id.* ¶ 32 (alleging that, "according to William Clark," "discomfort was not relieved by Kathryn Bass' offered dispensation" to "refrain from divulging the information to other students in their group"). But Clark's subjective "discomfort" with refraining from speaking—when he was expressly told that he may do so—does not make his speech compelled under the First Amendment.

Since the only alleged speech—labeling his identities—was expressly not compulsory, Clark's compelled-speech claim fails at the starting gate. The case law supports this uncontroversial position. For example, in *C.N.*, school officials administered a survey to students inquiring into their personal associations and views on matters of public interest (and other personal experiences). Students claimed compelled speech, but the Third Circuit held that "Plaintiffs have not shown the compulsion necessary to establish a First Amendment violation." 430 F.3d at 189. "Even assuming the School Defendants forced students to take the survey," the court explained, "there was no evidence of some type of disincentive or penalty if the survey was not completed … or if certain answers were or were not selected." *Id.* (quotation marks and citation omitted). On the contrary, "[t]he record supports only that students were made to sit in chairs and put pen to paper during administration of the survey," not that they were "threatened or actually punished … for failure to complete the survey." *Id.* Just so here. Clark was not penalized or threatened with any penalty for declining to label his identities. He was, at most, made to sit in a chair and put keys to keyboard in a Google doc. It was only after he refused to attend class *at all* and perform *any* coursework for it that Democracy Prep rightly informed him that he would receive a failing mark, and then rightly gave him a D-. Under these circumstances, Clark has not been "compelled" to speak and so has not plausibly alleged a First Amendment claim—let alone a clearly favored one.

*Second*, even if the assignments had been compulsory, DPAC still would not have violated the First Amendment because the school did not require Clark to profess a belief. As the Supreme Court

14

held in *West Virginia State Board of Education v. Barnette*, the First Amendment both protects "the individual's right to speak his own mind" and prohibits "public authorities to compel him to utter what is not in his mind." 319 U.S. 624, 634 (1943). Thus, the state cannot "force[] an individual … to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). But coursework that does not compel students to profess any belief does not violate the First Amendment, even if it is mandatory and even if a student disagrees with the material.

That is plain from *Barnette* itself. There, the Supreme Court held that schools could not compel students to salute and pledge allegiance to the American flag. The constitutional problem, the Court emphasized, was that students "are not merely made acquainted with the flag salute so that they may be informed as to what it is or even what it means"; instead, there was "a compulsion of students to declare a belief." 319 U.S. at 631. But the Court emphasized that "the State *may* require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty which tend to inspire patriotism and love of country"—it just may not impose a "compulsory flag salute and pledge," because doing so "requires affirmation of a belief and an attitude of mind." *Id.* at 631, 633 (quotation marks and citation omitted) (emphasis added).

Under these principles, courts routinely reject students' claims that coursework violates the First Amendment when it requires them to profess no particular belief. As the Ninth Circuit explained, "a teacher may require a student to write a paper from a particular viewpoint, even if it is a viewpoint with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) (university did not violate First Amendment by failing a graduate student whose thesis had a noncompliant "acknowledgments" section); *see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 242-243 (2000) (Souter, J., concurring) (university students "are inevitably required to support the expression of personally offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach."); *C.N.*, 430 F.3d at 187 ("while a public educational institution may not demand that a student profess beliefs or views with which the student does not

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1   agree," "First Amendment jurisprudence recognizes that the educational process itself may sometimes

2   require a state actor to force a student to speak when the student would rather refrain," a "student may

3   also be forced to speak or write on a particular topic even though the student might prefer a different

4   topic," and "a school may in some circumstances require a student to state the arguments that could be

5   made in support of such beliefs or views").

6        In *Wood v. Arnold*, for example, a high-school student objected to a world-history course

7   worksheet requiring her to "fill in the blanks" of an Islamic declaration of faith.  915 F.3d 308, 312 (4th

8   Cir. 2019).  The Fourth Circuit rejected her compelled-speech claim, explaining that this right "has

9   limited application in a classroom setting in which a student is asked to study and discuss materials

10  with which she disagrees" and that the "assignment did not require Wood to profess or accept the tenets

11  of Islam," but merely to perform "an academic exercise to demonstrate her understanding of the world

12  history curriculum."  *Id.* at 319.  Or in *Keeton v. Anderson-Wiley*, a graduate student in counseling

13  objected to participating in a remediation plan on counseling ethics after she "said that it would be

14  difficult for her to work with GLBTQ clients and to separate her views about homosexuality from her

15  clients' views."  664 F.3d 865, 868 (11th Cir. 2011).  The Eleventh Circuit rejected her compelled-

16  speech claim, explaining that the university was "not forcing Keeton to profess a belief contrary to her

17  own personal beliefs" and that "the Supreme Court has hardly indicated an intention to limit a school's

18  power to require its students to demonstrate whether they grasp a particular lesson" since a "school

19  must, for instance, be free to give a failing grade to a student who refuses to answer a test question for

20  religious reasons, or who refuses to write a paper defending a position with which the student

21  disagrees."  *Id.* at 878-79.

22        Clark's compelled-speech claim falls squarely within this line of cases.  Like the students in

23  *Wood* and *Keeton*, Clark was required to study and discuss, demonstrate he understood, and complete

24  assignments about materials with which he evidently disagrees.  But Clark never alleges—and could

25  not allege—that Democracy Prep required him to profess or accept any belief or tenet contrary to his

26  own.  *See, e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1031 (9th Cir. 1998) ("[T]he

27  fact that a student is required to read a book does not mean that he is being asked to agree with what is

28  in it.").  On the contrary, the assignments to which Clark objects were aimed at soliciting students'

16

*personal* views and beliefs for reflection and introspection. *See, e.g.*, Compl. ¶ 30 ("independent reflection" on "gender, racial, and religious identities"); *id.* ¶ 31 (self-categorize identities based on self-reflections). The subsequent group discussion—during which students were told "You DO NOT have to share your identities!"—probed these personal views rather than requiring profession of other views, including by asking "How did this activity make you feel?" and "Did you learn anything about yourself?" Course Materials at 23. Under these circumstances, Clark has no viable claim—let alone a clearly favored claim—that Democracy Prep compelled him to publicly profess any belief whatsoever.

Clark's supposed compelled-speech claim instead boils down to a disagreement with curricular decisions. But curricular preferences like Clark's desire for a "conventional civics curriculum" do not give rise to a constitutional claim, Compl. ¶ 25. *See, e.g.*, *W.C. v. Rowland Unified Sch. Dist.*, 2017 WL 11509987, at *1 (C.D. Cal. June 15, 2017) (rejecting First Amendment claim by student alleging he received failing grade because of expressed political ideologies); *Head v. Bd. of Trs. of Cal. State Univ.*, 2006 WL 2355209, at *1 (N.D. Cal. Aug. 14, 2006) (denying compelled speech claim by student who refused to participate in multiculturalism course), *aff'd*, 315 F. App'x 7 (9th Cir. 2008). Instead, the Sociology of Change curriculum passes constitutional muster because it is rationally related to Democracy Prep's legitimate pedagogical interest: to foster "Authentic Civic Engagement" through "civic initiatives, community engagement, [and] speech and debate" so students can "acquire the knowledge, skills, and attitude to change the world." *See About Democracy Prep*, Democracy Prep Public Schools, https://democracyprep.org/about/ (last visited Feb. 6, 2021). Thus, the facts and law do not clearly favor this claim—they decisively reject it. Clark's request for preliminary mandatory injunctive relief on its basis should therefore be denied.

**B.     The Law Does Not Clearly Favor The First Amendment Retaliation Claim**

Clark's second First Amendment claim alleges retaliation for protected speech, and it is equally disfavored on the facts and law. Clark primarily alleges that Democracy Prep "retaliated against [him] with a failing grade and threats of non-graduation when he declined to participate" in his course. Compl. ¶ 2; *see also id.* ¶ 53 ("Defendants followed through on their threats of retaliation and gave Plaintiff William Clark a D- for the 'Sociology of Change' class, which by DPPS standards is failing.");

/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

17

1   *id.* ¶ 70 ("Failing and threatening his graduation from high school is unlawful retaliation[.]").[5] ███

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████████████████████   To succeed on his retaliation claim, Clark must show that

5   (1) his complaints qualify as a constitutionally protected activity; (2) Democracy Prep's actions would

6   chill a person of ordinary firmness from the protected activity; and (3) the protected activity was a

7   substantial motivating factor in Democracy Prep's conduct. *See Koala v. Khosla*, 931 F.3d 887, 905

8   (9th Cir. 2019).  Clearly, neither allegation meets this test on the law and facts alleged.

9          To begin, Clark's complaints (even if protected) were not met with actions that would chill a

10  person of ordinary firmness.  After the first meeting about Clark's email raising "[a] concern regarding

11  [the] class," Mr. Johnson emailed Clark "to make sure you know that I think it is critically important

12  to understand people's perspectives and understand how to best support them while working within the

13  framework and value system of our school."  Johnson Decl., Ex. D (Sept. 16, 2020 email from Johnson

14  to Clark).  He told Clark, "I want you to be in a school where you believe your opinions are valued,

15  you feel safe, and you are welcomed as a scholar and human."  *Id.*  He later re-emphasized his openness

16  to "further discuss[ing] how we can ensure we provide a safe and welcoming environment for William."

17  Johnson Decl., Ex. E (Sept. 18, 2020 email from Johnson to Gabrielle Clark).  Clark's teacher similarly

18  told him that she "want[ed] to make sure we can push forward in class together and make sure you

19  finish out your senior year strong."  Johnson Decl., Ex. F at 2 (Oct. 2, 2020 email from Bass to Clark).

20  When Clark still did not return to class, Mr. Johnson emailed again to "discuss next steps for you to

21  complete the Sociology of Change course and remaining on the path towards graduation," Johnson

22  Decl., Ex. F at 2 (Oct. 12, 2020 email from Johnson to William & Gabrielle Clark), and later again to

23  express his "hope" that Clark would "fully engage in the course work and discussions" but also explain

---

[5] As a matter of school policy, Democracy Prep prefers not to give D grades and will not promote students from one grade to the next without a grade of A, B, or C in required classes.  Instead, it prefers to work to ensure that students grasp necessary course material and receive grades that will allow them to attend college following graduation.  *See* Compl., Ex. C ("DPAC Handbook") (ECF No. 1-4) at 23.  However, students will be given failing grades where appropriate, including where, as here, a student completely refuses to engage with a course or complete any of the assigned work.  *See* Johnson Decl. ¶ 16.  *See also* DPAC Handbook at 18 ("The school may require a family conference if the scholar has failing grades[.]"); 23 (describing an "F" grade as below 70%).

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

that Clark could still "finish the Sociology of Change course doing the minimum amount of work required to pass."  Johnson Decl., Ex. F at 1 (Oct. 19, 2020 email from Johnson to Gabrielle Clark).  That last email concluded: "I hope William returns to class this week so he can catch up on missed work and begin to participate in the final few weeks of the semester.  All of us want William to graduate from DPAC and do so while thriving …."  *Id.*  In sum, Clark's complaints were met with encouragement, kindness, and support, and with every effort to *prevent* Clark from failing and *ensure* his graduation.  A person of ordinary firmness would not have been chilled from voicing concerns by this response.  *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016) ("[T]he test for determining whether the alleged retaliatory conduct chills free speech is objective" asking "whether the retaliatory acts would lead ordinary students in the plaintiffs' position to refrain from protected speech.") (citations, alterations, and internal quotation marks omitted).

Nor did Clark's complaints about the course substantially motivate his failing grade.  When Clark voiced concerns, Democracy Prep did not respond by failing him—it responded with efforts to ensure he would *not* fail the class, described above.  In his very first email on September 14, Clark told his teacher that he knew he "should be in your class right now, but I have left" and that he and his mother had "come to the agreement that I will not be attending your class until further notice."  Johnson Decl., Ex. C (Sept. 14, 2020 email from Clark to Bass).  When Mr. Johnson asked to discuss "next steps for [Clark] to complete the … course and remaining on the path towards graduation," Clark's mother responded: "William will not be attending Sociology of Change."  Johnson Decl., Ex. F at 1 (Oct. 12, 2020 email from Gabrielle Clark to Johnson & Bass).  And when Mr. Johnson explained that Clark could finish by "doing the minimum amount of work required," his mother wrote: "William Clark will not be participating in any type of Critical Race Theory class.  This includes but isn't limited to Sociology of Change."  Johnson Decl., Ex. G (Oct. 19, 2020 email from Gabrielle Clark to Johnson).  If Clark's complaint had substantially motivated his failing grade, then Democracy Prep would have failed him immediately after he complained—not made every effort to ensure he *did not* fail.  And if Clark never complained but still refused to attend class or do assignments, he still would have failed—*any* student refusing to attend class or do assignments would fail.  His failing grade was therefore not

/ / /

19

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

1  retaliatory, since Democracy Prep "would have taken the same action even in the absence of the

2  protected conduct." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001).

3  ███████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████████████

12 **C.    The Law Does Not Clearly Favor Clark's Discrimination Claims**

13      Clark also contends that his Sociology of Change assignments "trafficked in racial, sexual and

14 gender stereotypes which objectively created a hostile environment," Mot. 20, violating Title VI, Title

15 IX, and the Equal Protection Clause.  He insists that these "exercises should be enjoined," his failing

16 "grade should be expunged" and he should be "afforded the opportunity to earn the missed credits with

17 another class or project."  Mot. 22, 24.  But Clark cannot show that the facts and law clearly favor these

18 claims, entitling him to a mandatory injunction.

19      Clark's allegations do not amount to discrimination on the basis of race or sex.  To establish a

20 hostile educational environment, Clark must show race-or sex-based harassment that "severe,

21 pervasive, or persistent," thus depriving him of access to educational benefits.  *Nkwuo v. Angel*, 693 F.

22 App'x 696, 697-698 (9th Cir. 2017).  Certain extreme circumstances meet this high bar.  *See, e.g.*,

23 *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) (Black students forced to

24 attend class in rooms with the n-word graffitied on the walls).[6]   But Clark alleges no such

25

26 [6] Other circumstances of a hostile education environment include: a student being delivered a hand-drawn picture
of a lynching by several classmates who then broke into her locker and repeatedly wore confederate flags around

27 her, *Davison ex rel. Sims v. Santa Barbara High Sch. Dist.*, 48 F. Supp. 2d 1225, 1226 (C.D. Cal. 1998); school
policy segregating students based on race, describing students of color as being in the "ghetto" class, and
labelling Hispanic students as ESL students even though they did not speak Spanish, *T.V. v. Sacramento City*

28 *Unified Sch. Dist.*, 2016 WL 397604, at *5 (E.D. Cal. Feb. 2, 2016); a teacher who failed a Black student in

circumstances. He alleges that a handful of lessons engaged with issues of sex, gender, and race in a way that *he disliked*. In those lessons, Clark was asked to identify his race and sex on a private form and independently reflect on them, and then was invited (but expressly not required) to discuss them with his classmates. That is it—he alleges nothing more. That is not harassment at all, let alone harassment so severe and pervasive that it creates a discriminatorily hostile education environment.

Clark also cannot show, as he must, that the school acted "with deliberate indifference" to the harassment such that its response was "clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 630, 633 (1999). On the contrary, as detailed above, Democracy Prep's response was conscientious and thorough. After Clark's first email, the school promptly reached out and held a meeting with Clark and his mother; it considered his request to skip the course and provided a detailed and careful reason for denying it; and it offered several options for Clark to receive credit for the course, including completing assignments after the fact and completing the course with a trusted faculty mentor. *See supra* at 6-9. This is not deliberate indifference or clearly unreasonable—it is the work of careful educators who care about students.

Otherwise, Clark attempts to challenge the curriculum itself as "per se discriminatory." Mot. 22-23; Compl. ¶ 94 (referring to curriculum's "discriminatory content and application"). That attempt has no merit, let alone clear favor. Discrimination claims are "not a means for challenging curriculum content decisions in public schools." *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1232 (N.D. Cal. 2017), *aff'd*, 973 F.3d 1010 (9th Cir. 2020); *see also Monteiro*, 158 F.3d at 1028 (courts may not intervene via Equal Protection or Title VI to ban materials from school curriculum "even when the works are accused of being racist in whole or in part"). Rather, "the curriculum of a public educational institution is … a policy with which others do not have a constitutional right to interfere." *Brown*, 308 F.3d at 951. Schools therefore may "require that a student comply with the terms of an academic assignment" and need not "change the assignment to suit the student's opinion." *Id.* at 949; *Marin v. Eidgahy*, 2012 WL 928250, at *9 (S.D. Cal. Mar. 19, 2012) ("[W]hen a teacher makes an assignment … the student has no constitutional right to do something

concert with saying that she did not "want watermelon seeds all over the floor," *Lee v. Bd. of Trs. of Cal. State Univ.*, 2015 WL 4272752, at *2 (C.D. Cal. July 14, 2015).

21

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

other than that assignment ….").  Any other rule would "effectively give each student veto power over curricular requirements."  *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292 (10th Cir. 2004).  But "putting [ideas] on trial in our courts" is not "the proper way to determine the appropriateness of their use in the classroom"; "[s]uch judgments are ordinarily best left to school boards and educational officials charged with educating young people and determining which education materials are appropriate for which students, and under what circumstances."  *Monteiro*, 158 F.3d at 1031-1032.

Finally, Clark attempts to repackage his retaliation claim with the unsupported assertion that his failing grade "was racially motivated retaliation."  Mot. 22.  That retaliation claim fails because Clark does not allege that he engaged in protected activity—that is, complaints about race or sex discrimination.  Neither his email nor his mother's emails mention race or sex.  This claim also fails for the reasons that the First Amendment retaliation claim fails: Clark did not experience a material adverse action from the allegedly protected activity—his complaint about the course—but instead from his refusal to attend class and complete assignments.  *See, e.g.*, *Williams v. City Univ. of N.Y.*, 2011 WL 6934755, at *5 (E.D.N.Y. Dec. 30, 2011) (race-neutral explanation for a grade did not give rise to a plausible inference of an underlying racial motivation for the grading decision).

## III.   Clark Otherwise Fails To Justify The Extraordinary Relief That He Seeks

Although Clark acknowledges (at 14) that, to obtain the relief he seeks, he must demonstrate that he is likely to suffer irreparable harm absent preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest, he makes little effort to address these requirements—resting instead on the assertion that a First Amendment violation alone suffices to warrant a preliminary injunction.  That is wrong as a matter of law, *see Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019), and in any event he has not demonstrated any First Amendment violation, *see supra* 13-21.  Even if Clark had shown a First Amendment violation inflicting irreparable harm, two important considerations warrant denial of his application for extraordinary relief.

*First*, the order Clark seeks—mandating that a school expunge a particular grade, modify its graduation requirements, and change its curriculum—is manifestly against the public interest.  As discussed above, mandatory injunctions are uniquely disfavored.  That is particularly the case in the context of education, where federal courts abstain from countermanding the considered judgment of

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone (702) 792-3773
Facsimile (702) 792-9002

professional educators.  *See, e.g.*, *Brown*, 308 F.3d at 948 (affirming denial of injunctive relief, which sought to stop the university's decision to not include plaintiff's master's thesis in the university library as a first amendment violation); *Harris v. Morris*, 2017 WL 8776683 (6th Cir. Oct. 26, 2017) (denying injunctive relief to a student who sought to alter the grades he received in two graduate courses); *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 48 (3d Cir. 1986) (denying a preliminary injunction seeking to force re-evaluation of a student's work and dismissal from the university graduate program).[7]  As one court explained in declining to enjoin a school system's promotion and retention policy, the public interest is harmed by "having a carefully engineered … policy superseded by a federal court, outweighing the policy decisions made by an elected school board in a public deliberative process."  *Erik V. ex rel. Catherine V. v. Causby*, 977 F. Supp. 384, 389 (E.D.N.C. 1997).  The court continued: "The administrators and teachers in the Johnston County schools would also suffer a lapse of credibility from the sudden overturning of a policy they have been enforcing in their classrooms, as well as from the disruptive effect of having students deemed unready for promotion being mixed in with others ready for the challenges of a new grade."  *Id.*  The same is true here.

*Second*, the relief that Clark seeks in this motion is not "temporary" or "preliminary," but rather is the same ultimate relief that he seeks in this lawsuit: an expunged grade, a new report card, permission to graduate without meeting the requirements, and a change to Democracy Prep's curriculum.  That requested relief would effectively be a final adjudication of the ultimate rights in controversy.  *See Taiebat v. Scialabba*, 2017 WL 747460, at *3 (N.D. Cal. Feb. 27, 2017); *Rothberg v. Law Sch. Admissions Council*, 102 F. App'x 122, 125 (10th Cir. 2004) (reversing preliminary injunction requiring defendant to report results of law school admissions test because, among other reasons, it mooted the case prior to a full trial on the merits).  It would be profoundly unfair for the

---

[7] *See also, e.g.*, *Hearn v. United States*, 2020 U.S. Dist. LEXIS 59871 (E.D.N.Y. Mar. 31, 2020) (denying request for injunctive relief related to plaintiff's low grades, evaluations, and disenrollment from the US Merchant Marine Academy); *Alsup v. Nw. Shoals Cmty. Coll.*, 2016 WL 5253212 (N.D. Ala. Sept. 22, 2016) (denying claim for injunctive relief as lacking a basis in a cause of action after due process claims regarding academic dismissal were denied); *McCann v. Univ. at Buffalo*, 2016 U.S. Dist. LEXIS 98994 (W.D.N.Y. July 27, 2016) (magistrate recommended summary judgment, later adopted by the court, denying plaintiff's requested injunctive relief that the court reverse her failing grade, since the decision was not a departure from academic norms); *Maffeo v. Nevada*, 2010 WL 4136985, at *2 (D. Nev. Oct. 19, 2010) (denying injunctive relief in response to academic dismissal), *aff'd*, 461 F. App'x 629 (9th Cir. 2011); *Hammond v. Auburn Univ.*, 669 F. Supp. 1555 (M.D. Ala. 1987) (denying injunctive relief from a plaintiff seeking to have the adoption of a university bulletin with academic guidelines declared unconstitutional), *aff'd*, 858 F.2d 744 (11th Cir. 1988).

1   Court to, in effect, make a final adjudication of the merits at this early stage of the case, particularly

2   where the relief sought is mandatory in nature and would alter, rather than preserve, the status quo.

3   "[A] judgment on the merits in the guise of preliminary relief is a highly inappropriate result." *Senate*

4   *of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992).

5                                                    **CONCLUSION**

6          For these reasons, the motion should be denied in its entirety.

7          DATED this 8th day of February, 2021.

8                                                    **GREENBERG TRAURIG, LLP**

9

10

11          */s/ Kara B. Hendricks*
            MARK E. FERRARIO, ESQ.
12          Nevada Bar No. 1625
            KARA B. HENDRICKS, ESQ.
13          Nevada Bar No. 7743
            10845 Griffith Peak Drive, Suite 600
14          Las Vegas, NV 89135

15          *Attorneys for Defendants Democracy Prep Public*
            *Schools, Democracy Prep Public Schools, Inc.,*
16          *Democracy Prep at the Agassi Campus, Democracy*
            *Prep Nevada LLC, School Board of Democracy Prep*
17          *at the Agassi Campus, Natasha Trivers, Adam*
            *Johnson, Kathryn Bass, Joseph Morgan, PhD, and*
18          *Kimberly Wall*

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on the 8th day of February, 2021, a true and correct copy of the foregoing

3 **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR**

4 **PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** was filed

5 electronically via the Court's CM/ECF system.  Notice of filing will be served on all parties by operation

6 of the Court's EM/ECF system, and parties may access this filing through the Court's CM/ECF system.

7

8                                    _____/s/ Andrea Flintz_____

9                                    an employee of Greenberg Traurig, LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

25