**Marquis Aurbach Coffing**
Brian R. Hardy, Esq.
Nevada Bar No. 10068
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
bhardy@maclaw.com

Jonathan O'Brien, NYB No. 5043369
(Admitted Pro Hac Vice)
Law Office of Jonathan O'Brien
Telephone: (646) 308-1689
43 W. 43rd St, Suite 002
New York, NY 10036
Jobrien@burnsobrienlaw.com

*Attorneys for Plaintiffs William Clark and Gabrielle Clark*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| GABRIELLE CLARK, individually and as parent and guardian of WILLIAM CLARK and WILLIAM CLARK, individually,<br><br>Plaintiffs<br><br>v.<br><br>STATE PUBLIC CHARTER SCHOOL AUTHORITY, DEMOCRACY PREP PUBLIC SCHOOLS, DEMOCRACY PREP PUBLIC SCHOOLS, INC., DEMOCRACY PREP at the AGASSI CAMPUS, DEMOCRACY PREP NEVADA LLC, SCHOOL BOARD of Democracy Prep at the Agassi Campus, NATASHA TRIVERS individually and in her official capacity as Superintendent and CEO, ADAM JOHNSON, individually and in his official capacity as Executive Director and Principal, KATHRYN BASS individually and in her capacity as Teacher, JOSEPH MORGAN, individually and in his official capacity as Board Chair, KIMBERLY WALL individually and in her capacity as assistant superintendent, and John & Jane Does 1-20<br><br>                         Defendants. | Case Number:<br>2:20-cv-02324-RFB-VCF<br><br>**REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION [ECF 44] TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER [ECF 19]** |

Plaintiffs Gabrielle and William Clark (collectively "Plaintiffs") by and through their attorneys of record herein, hereby submit their Reply to Defendants' Response in Opposition [ECF 44] to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order [ECF 19]. This Reply is made and based upon the papers and pleadings on file herein, the following Memorandum of Points and Authorities, and any oral argument allowed at the time of hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

It is axiomatic that students do not shed their First Amendment rights at the schoolhouse gate. *See Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969). It is equally fundamental that a school cannot, under the guise of "curriculum," invade its students' consciences and require them to affirm beliefs they find repugnant. *See W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). Democracy Prep at Agassi Campus and the other named Defendants (collectively "DPAC") violated these fundamental principles by requiring Plaintiff William Clark to "unlearn" his current beliefs and values and compelling him to affirm another set of beliefs about highly contested issues of race, sexuality, religion, privilege, and oppression. DPAC's opposition fails to rebut the clear showing that William has made of entitlement to preliminary injunctive relief. His motion should be granted.

### II. PLAINTIFFS HAVE SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS.

#### A. DPAC SOUGHT TO COMPEL WILLIAM TO AFFIRM BELIEFS ON HIGHLY CONTESTED MORAL AND POLITICAL ISSUES.

DPAC argues first that William's compelled speech claim fails because DPAC has not compelled him to say anything at all. ECF No. 44 (hereinafter "Opp.") at 12-14. It then argues that William suffered no First Amendment violation because the school did not require him to profess any particular belief. *Id.* at 14-16. Both assertions are plainly incorrect.

### 1. Required, graded assignments are compelled speech.

In his verified complaint, William alleges that the identity-labeling exercise were graded—i.e., **_required_**—assignments. ECF No. 1 (hereinafter "Compl.") ¶ 30. William's supplemental declaration clearly states that these exercises were a requirement, and the exhibits thereto confirm that fact. *See* William Clark Supplemental Declaration (hereinafter "Supp. Dec.") ¶¶ 3-4. Also graded was the follow-up requirement to determine whether "that part of your identity [*sic*] have privilege or oppression attached to it." *Id*. Exh.1. DPAC then required its students to identify the "unlearning" that each has to do in terms of their beliefs about gender, race, privilege, identity, and oppression—after directing students that "We Have A Lot of Unlearning To Do." *Id*. Other exercises required students to identify certain sexual, racial, ethnic, socioeconomic, or religious "identities" as "oppressors," full stop. Compl. ¶ 32.

"[T]he concept of compelled speech has never been limited to those cases in which the state seeks to impose or compel speech through threat of financial or criminal sanction." *Gralike v. Cook*, 191 F.3d 911, 918 (8th Cir. 1999). Rather, speech is compelled if a speaker will "suffer a penalty" for declining to speak. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). *See also Ariz. Students' Assoc. v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016) (hereinafter "*ASA*"). "[I]ndirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes." *Friedman v. Aranas*, No. 17-cv-00433, 2019 WL 7597663, at *4 (Dec. 27, 2019 D. Nev.) (quoting *Am. Cmm'cns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 402 (1950)).

Here, William has suffered a penalty for declining to speak: he currently has a D- grade in a required course which puts graduation at risk. DPAC, despite the supposed "accommodations" it offered, has never backed away from the requirement that William complete these exercises. The only accommodation on offer is that William may—the school will not commit to this point—raise his grade to a C- if he completes other course work. *See*

Johnson Dec. Exh. F; *id.* Exh. I (William must "commit to an action plan to complete the missed assignments"). That is, the school will penalize William for failing to speak, but possibly not so much that he completely fails the course. Opp. 8. And even that supposed "accommodation" is belied by the fact that DPAC has refused to assure William that graded identity confession assignments will not recur in in the course going forward. Compl. ¶ 37.

DPAC cites at length to *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) for the proposition that William has not been compelled to speak. Opp. 13. *C.N.* concerned a survey of high school students that gathered information about sexual conduct, drug and alcohol use, and other controversial personal matters. The court rejected the compelled speech claim because no names were attached to the survey, it was conducted by an outside organization, the survey results were reported anonymously, and the survey books were destroyed within 90 days. Most importantly, the survey was entirely voluntary and "there was no evidence of 'some type of disincentive or penalty if the survey was not completed.'" *Id.* at 189. Here, the school makes no accommodation that permits William not to speak, and there is threat of the most serious penalty the school can impose: failure to graduate.

DPAC also engages in a blatant sleight of hand when it argues that this speech was not compelled because William was not required to "publicly" affirm his identities. Opp. 13. *First,* this is not true: William was required to enter the statements on a Google document that was accessible by his teacher, the principal (who could view classroom discussions on Zoom); and other employees of DPAC and its organization. Compl. ¶¶ 30, 36. *See also* Bentheim Dec. (noting that "DPAC showed little regard for the privacy interests of students"). Speech is not less compelled because the speaker is not required to speak to the largest possible audience.

*Second*, DPAC ignores critical context: this was not a workplace or even a college classroom, where more mature persons might be able to successfully resist social pressure to speak. **These are high schoolers**. The Supreme Court has noted the "immense social pressure"

on high schoolers to fall into line when the entire community around them is speaking. *Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 292 (2000). *See also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (First Amendment principles must be "applied in light of the special characteristics of the school environment") (quoting *Tinker*, 393 U.S. at 506); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (noting the heightened concern for compulsion of speech in the school setting). Here, William was in a relatively small classroom setting in a "capstone" required course. The social pressure to speak in that context is enormous—even more than at the high school football game in *Santa Fe*. Moreover, as the only student in the class regarded as white (despite being biracial), the social pressure to speak about issues of racial and other identities is magnified. This pressure to speak was ratcheted up further by the fact that his teacher, Defendant Bass, preemptively revealed her identities to the class, aligning herself with various oppressed groups. Compl. Exh. A at 28. And even if William declined to speak, his silence—in a setting where whites were being preemptively labelled as oppressors—would certainly be considered by fellow students to be as meaningful as speaking. DPAC's blindness to the compulsion inherent in this context is willful.

Finally, DPAC argues that William at worst suffered mere "minimal" "discouragement." Opp. 13. This argument is absurd. To start, the cited "discouragement" standard is drawn from Fourth Amendment analysis. The Supreme Court held that border agents could open envelopes but not read the contents of letters suspected of contraband, and the Court declined "to consider the constitutional reach of the First Amendment" in that circumstance. *United States v. Ramsey*, 431 U.S. 606, 624 (1977). But here, First Amendment interests are near their zenith. *See also Friedman*, *supra* (noting that "indirect 'discouragements'" might violate the First Amendment). More importantly, it is extraordinary that a school would describe poor grades that might preclude a student from attending a preferred college or even ***graduating from high school*** as a "discouragement," not a penalty.

*Cf. Lee v. Weisman*, 505 U.S. 577, 595 (1992) ("Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions."). Compelled speech does not become permissible because the person doing the compelling unilaterally decides it is only applying a *little* compulsion. William has been penalized for not speaking. This is compelled speech. *Wooley*, *supra*.

### 2. In these assignments, William was compelled to "unlearn" his beliefs and affirm his belief in highly contested propositions.

Contrary to DPAC's opposition, *see* Opp. 14-16, the course curriculum and classroom exercises are replete with requirements that students accept and affirmatively profess DPAC's beliefs about highly contested political and cultural issues.[1]

To start, after forcing students to state their various identities of race, sexuality, religion, disability, socioeconomic status, etc., the school purports to decide for students the precise importance they must place on those identities: "[T]he realities stated above do not define me, but they are a part of me, and I embrace it." Supp. Dec. Exh. 1. Then, after stating their identities, students are required to determine whether any of those identities "have privilege or oppression attached to it" and if they are surprised by just how much privilege they have. Compl. ¶ 30, Supp. Dec. Exh. 1. In this case, the curriculum helpfully gives students the answer by identifying certain racial, religious, sexual, and socio-economic identities (including white, wealthy, and Christian) as inherently "oppressive" because they are "dominant ideologies." Compl. ¶ 32 and Exh. A at 34, 37; Supp. Dec. ¶ 10. The exercise then instructs students—using no less than two slides, two memes, and five bullet points, apparently to make the point abundantly clear—that "reverse racism doesn't exist" and that

---

[1] That the precepts taught in the Sociology of Change course reflect DPAC's institutional values is confirmed by the Bentheim Declaration, attached the Complaint. At ¶¶ 16-19, this former principal confirms that DPAC endorsed the critical race theory precepts taught in the class and structured both classroom instruction and school management around them. DPAC's endorsement of these precepts only heightens the compulsion inherent in William's class.

"people of color CANNOT be racist." Compl. ¶¶ 38-39 & Course Materials.

To call these assertions "highly contested" is an understatement. But their rightness or wrongness is beside the point. These assertions were not presented to students as a description of a theory with which students could disagree (or, notably, about which opposing views would be presented; none were). Instead, they were presented as *facts* that the student—in graded, required written exercises—had to *affirm* as true. In this particular context, how many high school students would feel free to resist "immense social pressure" coming directly from a teacher, *Santa Fe*, *supra*, and instead disagree with DPAC by affirming that, say, people should be judged by the content of their character and not the color of their skin, or that the god of the Judeo-Christian bible sometimes also hears the cry of the poor?

And the compulsion here went beyond simply requiring a public affirmation of belief in the assertion that, for example, people of color cannot be racist; that Christianity, as a "dominant ideology," is oppressive, or that we all participate in oppressive political structures. Instead, the curriculum requires students to identify the "unlearning" they have to do. The required class exercise is explicit on this point: in bristling capital letters it admonishes students, "We Have A Lot of Unlearning To Do." Compl. ¶ 34; Supp. Dec. Exh. 1. "Unlearning," of course, means abandoning "incorrect" pre-existing beliefs and embracing the beliefs that Sociology of Change presents to students as incontrovertible facts.

DPAC's opposition frankly admits that the course aimed at teaching students to "[u]ndo and unlearn" their "***beliefs, attitudes***, + behaviors that stem from oppression." Opp. 5 (quoting Course Materials 36) (emphasis added). This goal—facilitating unlearning and changing students' beliefs, not simply exposing them to a different set of beliefs—is highlighted again and again in the curriculum and class exercises, starting with the confident assertion that every student has "A Lot Of Unlearning To Do." Students were asked to identify their identities; told that they must "embrace" those identities; and then asked to reflect on

whether they were surprised "with the amount of privilege or oppression that you have attached to your identities." Supp. Dec. Exh. 1. Students were required to state "Why"—not *whether*—"it is important to learn about your identities," as if affirming various racial, religious, sexual, and socio-economic identities is self-evidently a critical element of personal growth. *Id*. Again and again, the emphasis in the Sociology of Change course is not simply on *learning about* a theory, but on *embracing* and *affirming* a theory, while rejecting what students "learned" before—and grading students on the extent to which that personal process of unlearning successfully occurs.

Nearly 80 years ago, the Supreme Court held that it was impermissible for a school to "require[] affirmation of a belief and an attitude of mind." *Barnette*, 319 U.S. at 633. DPAC's focus on "unlearning" pre-existing beliefs and affirming highly contested assertions about issues of racial, sexual, religious, and socio-economic identity is clearly a requirement that its students accept an "attitude of mind." This fact—shown by merely quoting DPAC's own *required* course exercises—demonstrates the inapplicability of the cases the school cites at pages 15-16 of its opposition. In those cases, schools required students to learn about various contested political or cultural notions or theories. But at DPAC, students are not merely required to learn about contested issues; they are required to identify pre-existing beliefs they must *unlearn* and to affirm various "orthodox[ies] in politics, nationalism, religion, or other matters of opinion" prescribed by the school. *Id.* at 642.

And again, the context matters here. *See Santa Fe*, *supra*. For example, in *Wood v. Arnold* (cited Opp. 16), students were required to fill in the blanks of an Islamic declaration of faith as part of a world history curriculum. The court held that this exercise was permissible because "viewed in the context in which they were presented," the materials "did not compel [plaintiff] to profess any belief." 915 F.3d 308, 312 (4th Cir. 2019). "[V]iew[ing] the effect of the challenged materials within the context in which they were used," it was clear that the

exercise merely required students to "identify the views of a particular religion," not profess them. *Id*. at 317. But the court's analysis certainly would have been different if the identification of Islamic religious beliefs had been accompanied by a prescription that students must also "unlearn" their current religious beliefs. Coupled with DPAC's unabashed endorsement of highly contested views on racial and other identities, the focus on "unlearning" demonstrates that Sociology of Change is not merely a neutral curricular choice.

It is offensive to the First Amendment "to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Barnette*, 319 U.S. at 642. DPAC's capstone course went one further: William was required not just to say what wasn't in his mind, but to "unlearn" what was. Not even the school board whose flag salute requirement the Supreme Court struck down in *Barnette* went quite that far. The school's attempt to veil naked coercion as "curriculum" is a clear violation of William's First Amendment rights.

### B. WILLIAM HAS SHOWN LIKELIHOOD OF SUCCESS ON HIS RETALIATION CLAIM.

DPAC argues that William's retaliation claim fails because (1) his complaint about the class was "not met with actions that would chill a person of ordinary firmness" and (2) those complaints did not "substantially motivate his failing grade." Opp. 17-20. Not so.

To start, the school's assertion that William should simply toughen up once again evidences willful imperviousness to context. "[T]he test for determining whether the alleged retaliatory conduct chills free speech is objective; it asks whether the retaliatory acts 'would lead ordinary student[s] ... in the plaintiffs' position' to refrain from protected speech." *ASA*, 824 F.3d at 868 (quoting *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016)). In *ASA*, a college student who was threatened with prohibition from serving in student government because of his political speech stated a retaliation claim. *Id*. If a college student's speech can be chilled by threats of being prohibited from participating in student government, DPAC

Page 7 of 14

1  cannot plausibly argue that ***threatening to withhold graduation from a high school student***
2  would not chill a person of ordinary firmness. The fact that William continued to refuse to
3  speak in the face of actual retaliation in the form of a D- grade not authorized by DPAC's
4  handook (Compl. ¶ 17) is irrelevant to his retaliation claim. *See O'Brien*, *supra* (test for
5  retaliation "is generic and objective. Whether O'Brien himself was, or would have been,
6  chilled is not the test"). And DPAC's assertion that William's refusal to speak did not
7  "substantially motivate his failing grade" is laughable. DPAC's own opposition acknowledges
8  the connection between William's D- and his refusal to complete the assignments. Opp. 1.
9  And it has pledged to continue to penalize him if he does not speak. Johnson Dec. Exh. F.

### C. WILLIAM HAS SHOWN THAT DPAC FOSTERED A RACIALLY AND SEXUALLY HOSTILE ENVIRONMENT.

DPAC argues that William has at worst alleged that he was exposed to "a handful of lessons engaged with issues of sex, gender, and race in a way that he disliked" and that this is insufficient to state a claim for a racially hostile environment. Opp. 20-21. But the Supreme Court has held that requiring disclosure of racial status or identity is impermissible if, by doing so, the required disclosure places "the power of the State behind a racial classification that induces racial prejudice." *Anderson v. Martin*, 375 U.S. 399, 402 (1964). Here, the required disclosure was the starting point that induced a racially hostile environment.

Again, DPAC's argument to the contrary ignores critical context. "Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances, including the victim's race and age." *T.V. v. Sacramento City Unified Sch. Dist.*, 15-cv-00889, 2016 WL 397604, at *5 (Feb. 2, 2016 E.D. Cal.) (quoting *Monteiro v. Tempe Union High Sch. Dist*., 158 F.3d 1022, 1033 (9th Cir. 1998)). Here, the record clearly shows that William has been deprived of educational services which he is entitled to by the racially charged atmosphere of the class, which in its first session boiled over with such racial recrimination the class was stopped. Compl. ¶ 41. The severity and pervasiveness of the

hostility is heightened by the fact that here the racial hostility is coming, in large part, from the teacher. In *Hayut v. State University of New York*, 352 F.3d 733, 739 (2d Cir. 2003), a female college student was repeatedly referred to by a professor as "Monica Lewinsky" during class. Though this banter may not on its face seem as egregious as some of the conduct described in cases cited at page 20 of the opposition, it nonetheless was sufficient to create a hostile environment because it came from the professor, who has a "great deal of authority over his students with respect to grades and academic advancement by virtue of that position." *Id*. at 744. Even greater is the apparent moral authority of a teacher (supported by the principal and the entire institutional structure) over a high school student, who is less mature and less psychologically secure than a college student. Yet Ms. Bass—despite knowing that William was the only student in her class who presented as white—used mocking slides featuring cartoon characters to insist that "reverse racism doesn't exist" and that "people of color CANNOT be racist." Compl. ¶¶ 38-39. William could not help but see such mockery as an invitation to others to attack. And that belief could only have been strengthened once she shut down classroom discussion when he objected to these precepts. Compl. ¶ 41.

DPAC again ignores the reality that these are high schoolers, ill-equipped to wield notions such as "oppression" and "privilege" without personalizing and weaponizing them against classmates. And if personalized, those notions would obviously focus on William, the only apparently white appearing pupil in the class. In such a circumstance, the onus was on DPAC to provide an educational setting in which students could *actually* feel safe, and not just pay lip service to notions of safety while still requiring students to engage in the identity framing exercise that caused the tumult in the first place.

### D. GABRIELLE CLARK HAS STANDING FOR HER INDEPENDENT INJURY TO PARENTAL RIGHTS.

DPAC also argues that William's mother Gabrielle lacks standing because she has no independent injury and no derivative standing because her son is 18, but Gabrielle does indeed

have an independent injury, in the form of unwarranted intrusion on her parental rights to form her son's conscience and to be his primary educator in the family's beliefs and values. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Courts recognize a parent has a protected liberty interest in the companionship and society of an adult child. *See Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985).

In the Sociology of Change class, William was instructed to "unlearn" and "fight back" against the Judeo-Christian principles Gabrielle imparted to her son throughout his childhood. Courts have afforded parents relief for a school's violation of these rights, recognizing that though schools stand in loco parentis in some respects, "there are nevertheless limitations on intrusions [of parental rights] by school authorities." *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000). It is these rights that Gabrielle seeks to vindicate. *See* Compl. ¶¶ 90-93.

### III. THE OTHER FACTORS IN THE PRELIMINARY INJUNCTION ANALYSIS WEIGH IN WILLIAM'S FAVOR.

William has shown that he will suffer irreparable harm and that the balance of the equities and public interest factors tilt sharply in his favor. This D- is causing William harm right now, as he applies to colleges, which means the balance of equities tilt in his favor. William has also shown other harms, including psychological and emotional harm caused by DPAC's continued compulsion and retaliation. Compl. ¶ 32. These facts would be sufficient even if it were not already the case that the irreparable harm and balance of the equities factors are presumed for First Amendment violations. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Moreover, securing First Amendment rights is inherently in the public interest. *See Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).

### IV. A MANDATORY INJUNCTION CHANGING WILLIAM'S GRADE IS NECESSARY TO AFFORD ANY RELIEF.

DPAC argues that the mandatory preliminary relief William requests is not warranted, but this argument ignores the fact that this grade is causing William substantial harm ***right***

*now*, and that immediate relief is required or that harm will become permanent. Opp. 22-24.

It is true that mandatory preliminary injunctions are generally disfavored in preference to preliminary relief that preserves the status quo. *See Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). But this preference presumes that the Court can freeze the parties in "the last peaceable uncontested status existing between the parties before the dispute developed" without causing harm to either side. 11A Wright & Miller, *Civil Proc. and Prac*. § 2948, at 136 n.14 (2019). That is not possible here. William is a strong student with good grades other than the D- in Sociology of Change that currently disgraces his transcript. Compl. ¶ 65. He is applying to colleges *right now*; transcripts are being prepared and sent *right now*. *Id*. ¶ 67. If this grade is not changed now, no future relief the Court may afford him will suffice to undo the harm he is likely to experience within days or weeks as colleges review those transcripts. In such a case, mandatory preliminary "injunctive relief may be warranted where preserving the status quo perpetuates harm against the moving party." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1007 (10th Cir. 2004) (en banc) (Seymour, J., *et al*., concurring in part). For William, delay in affording entitled relief is effectively a denial.

## **CONCLUSION**

It is sadly ironic that a school that claims to prepare students for "active citizenship" threatens to fail one for refusing to affirm ideas he doesn't believe. Fortunately for William Clark, the Constitution gives Defendants no such power. The motion should be granted.

Dated this 16th day of February, 2021.

MARQUIS AURBACH COFFING

By */s/Brian R. Hardy, Esq.*
Brian R. Hardy, Esq.
Nevada Bar No. 10068
10001 Park Run Drive
Las Vegas, Nevada 89145

Jonathan O'Brien, NYB No. 5043369
(Admitted Pro Hac Vice)
Law Office of Jonathan O'Brien
43 W. 43rd St, Suite 002

Page 11 of 14

New York, NY 10036
*Attorneys for Plaintiffs William Clark and Gabrielle Clark*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION [ECF 44] TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER [ECF 19]** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 16th day of February, 2021.

☒ I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☐ I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

GREENBERG TRAURIG, LLP
MARK E. FERRARIO, ESQ.
KARA B. HENDRICKS, ESQ.
10845 Griffith Peak Drive, Ste. 600
Las Vegas, NV 89135
ferrariom@gtlaw.com
hendricksk@gtlaw.com
*Attorneys for Defendants Democracy Prep Public Schools, Democracy Prep Pubic Schools, Inc., Democracy Prep at The Agassi Campus, Democracy Prep Nevada LLC, School Board of Democracy Prep at the Agassi Campus, Natasha Trivers, Adam Johnson, Kathryn Bass, Joseph Morgan, PhD, And Kimberly Wall*

OFFICE OF THE ATTORNEY GENERAL
AARON D. FORD
GREGORY D. OTT
100 N. Carson St.
Carson City, NV 89701
gott@ag.nv.gov

RYAN W. HERRICK
State Public Charter School Authority
1749 N. Stewart St. Ste 40
Carson City, NV 89706
rherrick@spcsa.nv.gov
*Attorneys for the State of Nevada ex rel. the State Public Charter School Authority*

　　　　　*/s/ Michelle Monkarsh*
　　　　　an employee of Marquis Aurbach Coffing