1  ALAN J. LEFEBVRE, ESQ.
   Nevada Bar No. 000848
2  WILLIAM D. SCHULLER, ESQ.
   Nevada Bar No. 011271
3  **LITIGATOR LAW**
   11830 Tevare Lane #1062
4  Las Vegas, Nevada 89138
   Telephone: (702) 840-6982
5  Facsimile: (702) 224-2135
   E-Mail:  alefebvre@litigatorlaw.com
6            wschuller@litigatorlaw.com

7  Attorneys for Plaintiffs

8

9              **UNITED STATES DISTRICT COURT**

10                **DISTRICT OF NEVADA**

11                      * * *

12  GABRIELLE CLARK; and WILLIAM          CASE NO. 2:20-cv-02324-APG-VCF
    CLARK,

13              Plaintiffs,              **FIRST AMENDED COMPLAINT
                                         FOR DECLARATORY AND
14      vs.                             INJUNCTIVE RELIEF**

15  DEMOCRACY PREP PUBLIC SCHOOLS,      **Jury Trial Demanded**
    Inc.; and DEMOCRACY PREP NEVADA
16  LLC; and DEMOCRACY PREP AGASSI
    CAMPUS; and NATASHA TRIVERS, in her
17  capacity as CEO of Democracy Prep Public
    Schools, Inc.; and KIMBERLY WALL, in her
18  capacity as assistant superintendent of
    Democracy Prep Public Schools, Inc.; and
19  ADAM JOHNSON, in his capacity as executive
    director of Democracy Prep Agassi Campus;
20  and KATHRYN BASS, in her capacity as a
    teacher at Democracy Prep Agassi Campus; and
21  JOSEPH MORGAN, in his capacity as
    president of Democracy Prep Agassi Campus;
22  and REBECCA FEINEN, in her capacity as the
    Executive Director of the State Public Charter
23  School Authority; and MELISSA MACKEDON
    (chair), RANDY KIRNER (vice chair),
24  SHELIA MOULTON, SAMI RANDOLPH,
    MALLORY CYR, TONIA HOLMES-
25  SUTTON, DON SOIFER, TAMIKA
    SHAUNTEE ROSALES, LEE FARRIS, in their
26  capacities as members of the State Public
    Charter School Authority
27
                Defendants.
28

Litigator Law
ATTORNEYS AT LAW

1. The First Amendment's freedom of speech includes both the right to speak *and* the right not to be compelled by the government to speak something you do not believe.

2. The First Amendment's application is sometimes unique in the K-12 school context. On the one hand, students' First Amendment rights do not stop at the schoolhouse door. On the other hand, schools may require students to learn things, show what they learned, and give them bad grades for failing to accurately demonstrate what they have learned.

3. Schools may require students to recite facts or make arguments even if the student does not like the facts or disagrees with the arguments. What schools may not do, however, is compel a student to speak his private opinions about his personal identity in front of his teacher and classmates in a way that is antithetical to his values and beliefs, as part of an overall class that creates a hostile educational atmosphere for someone with his background and beliefs. That is not learning and returning facts; that is compelling speech about otherwise private personal opinions.

4. Yet that is precisely what Defendants have done in its *Sociology of Change* class: as part of a class required for graduation, they made Plaintiff William Clark ("William") endure a series of exercises that required him to divulge his most intimate characteristics and beliefs, and graded him on it. And when he refused to continue participating in this ongoing investigation into his beliefs and background, he was given a grade that had a severe negative impact on his opportunities in the highly competitive world of college admissions.

5. Thankfully, Democracy Prep has decided that it will no longer prevent William from graduating because of this experience. But its partial change-of-heart does not remedy the damage done to his college admissions prospects or change his deservedness for a declaratory judgment and damages that right the wrong that has been done to this young man.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. This Court has jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

///

///

Litigator Law
ATTORNEYS AT LAW

8.     The Court may authorize Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 as well as FRCP 57 and FRCP 65, and the equitable powers of this Court.

9.     Venue is proper in the District of Nevada under 28 U.S.C. § 1391 because all or a substantial number of the events that gave rise to this action occurred in this district and a majority of the Defendants reside in this district. Democracy Prep Public Schools, Inc., and its leadership are headquartered in New York City, but operate a campus and employ administrators and teachers in this district.

## PARTIES

**A.     Plaintiffs**

10.     William is a senior at Democracy Prep at Agassi Campus. He resides in Clark County, Nevada.

11.     Gabrielle Clark is William's mother. She resides in Clark County, Nevada.

**B.     Defendants**

12.     Democracy Prep Public Schools, Inc. is a not-for-profit corporation registered in the State of New York and headquartered in the State of New York. It was formerly registered as a foreign nonprofit corporation in the State of Nevada, though that status is now revoked.

13.     Democracy Prep Nevada LLC is a domestic limited liability company registered in the State of Nevada. It identifies its street address for service of process in Carson City, Nevada, and its sole managing member is Democracy Prep Public Schools, Inc.

14.     Democracy Prep Agassi Campus is a domestic nonprofit corporation registered in the State of Nevada.  It identifies its street address in Carson City, Nevada, at the same address and with the same individual with authority to act as Democracy Prep Nevada LLC.

15.     Natasha Trivers is the CEO of Democracy Prep Public Schools, Inc. She is sued in that capacity.

16.     Kimberly Wall is assistant superintendent of Democracy Prep Public Schools, Inc. She is sued in that capacity.

///

Litigator Law
ATTORNEYS AT LAW

17.     Adam Johnson is executive director (principal) of Democracy Prep Agassi Campus. He is sued in that capacity.

18.     Kathryn Bass teaches the *Sociology of Change* class at Democracy Prep Agassi Campus. She is sued in that capacity.

19.     Joseph Morgan is president of Democracy Prep Agassi Campus. He is sued in that capacity.

20.     Rebecca Feinen is Executive Director of the State Public Charter School Authority. She is sued in that capacity.

21.     Melissa Mackedon (chair), Randy Kirner (vice chair), Shelia Moulton, Sami Randolph, Mallory Cyr, Tonia Holmes-Sutton, Don Soifer, Tamika Shauntee Rosales, and Lee Farris are the members of the board of the State Public Charter School Authority. They are sued in that capacity.

22.     At all times relevant to Plaintiffs' allegations, all of the Defendants were acting under color of state law for purposes of 42 U.S.C. § 1983.

## **FACTUAL ALLEGATIONS**

**Democracy Prep Public Schools, Democracy Prep Agassi Campus, and Nevada's State Public Charter School Authority**

23.     "Charter Schools in Nevada are public schools funded by the state," according to the State of Nevada Department of Education.[1]

24.     Charter schools operate according to a charter contract between an authorizer (here, the Nevada State Public Charter School Authority, hereinafter "SPCSA") and an operator (here, Democracy Prep Agassi Campus and Democracy Prep Nevada LLC, hereinafter together "DPAC"). The operator may in turn engage a management organization that provides curriculum, training, and operations (here, Democracy Prep Public Schools, Inc., hereinafter "DPPS").

///

///

///

---

[1] https://doe.nv.gov/Charter_Schools/ (last accessed May 3, 2021).

Litigator Law
ATTORNEYS AT LAW

25.     "Created in 2011, Nevada's State Public Charter School Authority is a governmental agency of the State of Nevada and a statewide charter school sponsor. The SPCSA authorizes public charter schools across the state and is responsible for oversight and monitoring of those schools to ensure positive academic outcomes for students and strong stewardship of public dollars."[2]

26.     The SPCSA is managed by a board of nine appointees, named as Defendants above. The board "[a]pproves charter applications, [a]pproves charter amendments, [a]pproves renewal of schools, and [r]evokes written charters/terminates charter contracts."[3]

27.     The SPCSA is run day-to-day by Rebecca Feiden, its executive director, who oversees the agency and is executive secretary of the board.

28.     The SPSCA is classified as a local education agency ("LEA") under Nevada law, which is a federal designation that is colloquially equivalent to school district.

29.     The SPCSA is responsible to practice "effective monitoring practices of schools [that it authorizes], including site evaluations and other methods of oversight."[4] SPCSA staff maintain a performance framework for schools, "recommend sanctions due to poor academic performance, financial or organizational problems," conduct "academic assessment and accountability," "conduct site visits and evaluations on a regular basis," "monitor assessment and accountability efforts," and conduct "site-visits and personal contact, to serve the interests of students."

30.     SPCSA's regular monitoring and oversight, when it identifies sufficiently substantial issues, can lead to investigation, intervention, sanctions, and ultimately non-renewal or revocation of an operator's charter.

31.     Part of SPCSA's monitoring and oversight is an online portal for parents to file complaints about charter schools, to which SPCSA staff review and response.

///

---

[2] https://charterschools.nv.gov/uploadedFiles/CharterSchoolsnvgov/content/Families/Strategic%20Plan%202019_FINAL_ADA(1).pdf (last accessed May 3, 2021).
[3] https://charterschools.nv.gov/uploadedFiles/CharterSchoolsnvgov/content/Families/SPCSA%20Roles%20Responsibilities%2012-02.2020.pdf (last accessed May 3, 2021).
[4] *Id.*

Litigator Law
ATTORNEYS AT LAW

32. DPAC is one of over fifty schools authorized by the SPCSA.[5]

33. DPAC's authorization by SPCSA is embodied in a charter issued by SPCSA, which is a signed contract between DPAC and SPCSA. (*See* ECF 1-3).

34. DPPS and DPAC first took over the Agassi Campus pursuant to a six-year charter contract with the Nevada Achievement School District on March 22, 2017, taking over the former Andre Agassi College Preparatory Academy, a charter school located on the same site that was unsuccessful.

35. The Legislature subsequently enacted Senate Bill 321, which moved schools chartered by the Achievement School District to the SPCSA effective June 3, 2019.

36. DPAC subsequently entered into a new charter from SPCSA which is the current document governing DPAC's operations and SPCSA's authorization.[6] The SPCSA Board voted on that contract as agenda item number 7 at its June 26, 2020 meeting.

37. In that contract, DPAC promises to "take all steps necessary to ensure that discrimination does not occur, as required by federal civil rights law." Charter at 2.4.1 (pg. 10).

38. According to the charter and Nevada law, SPCSA has "broad oversight authority over the Charter School and may take all reasonable steps necessary to confirm that the Charter School is and remains in material compliance with this Charter Contract, the Charter Application, and applicable law and regulation." Charter at 7.1.1 (pg. 21).

39. DPAC is operated by DPPS, the New York-based operator of a network of 21 charter schools across the country. DPPS sets the curriculum and systems used at DPAC and maintains overall operational responsibility for the schools and employees within its network.

40. DPPS is led by its CEO, Natasha Trivers. Her leadership team at DPPS's central headquarters includes Kimberly (Kim) Wall, an assistant superintendent.

41. DPPS and its member schools rely on a combination of public taxpayer dollars and private philanthropy to fund their schools, including federal dollars.

---

[5] https://charterschools.nv.gov/uploadedFiles/CharterSchoolsnvgov/content/ForParents/210405-Southern-SPCSA-School-List.pdf (last accessed May 3, 2021).

[6] *See* ECF Nos. 1-3. Rather than reattaching these exhibits to the First Amended Complaint, Plaintiffs incorporate them by reference to their ECF designation already on the Court's docket.

Litigator Law
ATTORNEYS AT LAW

42.     DPAC's 2020 general financial audit indicates it received $11.8 million in governmental funds, including nearly $1.4 million in federal funds in its 2020 fiscal year (ending June 30, 2020).[7]

43.     DPPS develops and distributes the curriculum used in its network schools, including the *Sociology of Change* curriculum at issue in this case. This curriculum amounts to a policy, pattern, or practice on the part of DPPS. Its use by DPAC, and DPAC's vigorous defense of it once challenged, shows that it is a policy, pattern, and practice of DPAC as well.

44.     DPPS and the DPAC Board, headed by Mr. Morgan, together hired Mr. Johnson as the executive director of DPAC. In that role, he functions as the principal of the school.

45.     DPPS and DPAC employ Mrs. Bass to teach the *Sociology of Change* class, among other subjects.

46.     The charter contract between SPCSA and DPAC states that "All employees of the Charter School shall be deemed public employees." Charter at 2.11.1 (pg. 14).

47.     DPAC currently serves approximately 1,100 students grades K-12.

**William & Gabrielle Clark**

48.      One of those students (DPPS prefers the term "scholars") is William, a senior at DPAC with a passion for music, which he plans to pursue in college and as a career.

49.     William started playing piano at age three, and started on the drum line in the first grade. At the former Andre Agassi College Preparatory Academy and at DPAC, William developed his academic interests in musicology and sound engineering. As a 12th grader, he has been in the application and interview process for colleges throughout this ordeal. He does all of this while working as a shift manager at a local fast food chain restaurant in order to help his family financially, managing "virtual learning," and living through this year's waves of lockdowns and stay-at-home orders.

50.     William was raised in his family's Judeo-Christian values.

///

---

Litigator Law
ATTORNEYS AT LAW

[7]     Downloaded from the Federal Audit Clearinghouse Image Management System, https://facdissem.census.gov/SearchResults.aspx (last accessed May 3, 2021).

51.   William first enrolled in Agassi Campus in sixth grade, when it was then Andre Agassi College Preparatory Academy. He continued with DPAC when it acquired Agassi Academy's property and program.

52.   William is the youngest son of Mrs. Clark.  Mrs. Clark is the widowed mother of five. She has brought up her children according to her Judeo-Christian values, including the proposition that every person is unique and equal before the eyes of God and will be judged by the content of their character rather than the color of their skin.

53.   Mrs. Clark is very involved in the education of her children, all five of whom attended charter schools at some point.

**William, Ms. Bass, and the *Sociology of Change* Class**

54.   According to one news report, looking at DPPS schools broadly, "Unique among the nation's major charter school networks, Democracy Prep places civics education at the heart of its academic mission. High schoolers study politics and sociology, completing extensive capstone projects during their senior year; younger students are pushed to discuss current events, lobby state lawmakers and take part in voter registration drives."[8]

55.    When DPAC replaced Agassi Academy, DPPS's civics emphasis replaced the general focus on college preparation that had characterized Agassi Academy. What parents did not know, and were not told, was that this new "civics" curriculum was not just traditional teaching about how a bill becomes a law. Instead, it was a radical transformation across the school, especially in the high school, from regular social studies to a highly controversial new approach with deeply divisive programming around race, religion, and sexuality.

56.   The new curriculum is not about learning the social studies equivalents of the A-B-C's. In fact, it's not really about learning at all. Its purpose is to help students "unlearn" what they know about the world, and what their parents have taught them to believe, and instead to adopt a new worldview that "fights back" against "oppressive" social structures such as family, religion, and racial, sexual, and gender identities. [9] As part of that (re)programming, students are required

---

[8] https://www.the74million.org/article/democracy-preps-expansion-woes-raise-questions-about-whether-civics-education-can-be-brought-to-scale/ (last accessed May 3, 2021).

[9] *See generally* ECF Nos. 1-2.

Litigator Law
ATTORNEYS AT LAW

1   to reveal and discuss their personal views and identities, in order for the teacher and other students

2   to know who needs the most "unlearning." These identities and beliefs are then singled out by the

3   curriculum as inherently problematic, and attacked as such.

4        57.     At the end of August 2020, at the start of his final school year, William began the

5   year-long *Sociology of Change* class required of all DPAC seniors taught by Ms. Bass. The class

6   runs in tandem with another project-based requirement, *Change the World*.

7        58.     "Hello my wonderful social justice warriors!" Ms. Bass greeted William and his

8   class via an email on September 8, 2020. Ms. Bass then requested each student to "label and

9   identify" their gender, racial, and religious identities as part of "an independent reflection" exercise

10  which was graded. The next step was to determine if "that part of your identity have privilege or

11  oppression attached to it." Privilege was defined as "the inherent belief in the inferiority of the

12  oppressed group." The teacher's material stated who qualified as oppressors, and who in virtue of

13  their gender and race harbored "inherent belief in the inferiority" of others. As a result, Ms. Bass

14  explicitly assigned moral judgments to pupils based on their race, gender, sexual orientation, and

15  religion. William felt that if he had submitted to the terms of this exercise, he would have been in

16  effect adopting and making public affirmations about his racial, sexual, gender identities, and

17  religious background that he believed to be false and which violated his moral convictions. He

18  also did not wish to profess his identities on command in a non-private setting.

19       59.     After Plaintiffs objected in early September to the coercive and ideological nature

20  of the *Sociology of Change* class, DPAC Principal Johnson informed Mrs. Clark that the theoretical

21  basis of the revamped *Sociology of Change* course is known as "intersectionality," and is inspired

22  by political activist, academic, and "Critical Race Theory" proponent Kimberlé Crenshaw, who is

23  featured prominently in the course materials.

24       60.     William's first graded assignment for the class was worth ten points and required

25  him to reveal his racial, sexual, gender, sexual orientation, disabilities, and religious identities. He

26  was required to submit his race, gender, sexual orientation, and disabilities "if any" in a homework

27  assignment due by September 21 and which was "graded for completion" for a total of 20 points.

28  Upon information and belief, such assignments continued at least until October 2020.

61.     A "vocab reminder" visual graphic from the same class instructed participants that "oppression" is "malicious or unjust treatment or exercise of power." The lesson categorized certain racial and religious identities as inherently "oppressive," singling these identities out in bold text, and instructed pupils including William who fell into these categories to accept the label "oppressor" regardless of whether they disagreed with the pejorative characterization of their heritage, convictions, and identities. The familial, racial, sexual, and religious identities that were officially singled out and characterized as "oppressive" were predetermined by Defendants' class material from the outset and highlighted as such in bold text, prior to any discussion between student and teacher.

62.     William could not bring himself to accept or affirm these labels, which he conscientiously believed were insulting to his self-identity and his family. William refused to submit to racial, sexual, and religious labeling exercises carried out in a non-private setting which was coercive in its very nature and trafficked in intimate personal matters that are outside the legitimate scope of education.

63.     After Ms. Bass directed William and his fellow students to "label and identify" their various identities, and placed them in the designated "oppressive" categories, the next step was to "breakout" into groups to discuss with other pupils, asking and answering accusatory personal questions, including "Were you surprised with the amount of privilege or oppression that you have attached to your identities?" and "How did this activity make you feel?" Those students who did not "feel comfortable or safe enough to do so," presumably those whose identities were oppressive, were permitted to refrain from divulging the information to other students in their group, Ms. Bass assured them. However, discomfort was not relieved by Ms. Bass' offer, according to William. The structure of the class ensured that any pupil of a certain perceived race, gender, or sex who declined to participate only highlighted his status as an "oppressor" who harbored inherent "privilege." Pupils remained visible to one another in the classes that were virtual, Ms. Wall said, their faces stacked around the teacher "like the opening credits of the Brady Bunch." Defendants' class presentation also stated that denial of these identity characterizations amounts to unjust privilege "expressed as denial."

64. Defendants' class exercises forced upon William a deliberately designed psychological dilemma: participate in the exercise in violation of his conscience and be branded with a pejorative label; or conscientiously refrain from participation, and suffer isolation from his classmates and be maligned by the same labeling regardless.

65. The official, derogatory labeling included in the curriculum was not only based upon invidious racial distinctions, but also upon the basis of religious, sexual, and gender discrimination. In addition to the "white" racial identity, Defendants singled out and assigned negative moral judgments to pupils who fell into male, heterosexual gender/sex identities and Christian religious categories, calling them intrinsically oppressive, the materials defining "oppression" as "malicious or unjust" and "wrong." William was compelled to participate in public professions of his racial, religious, sexual, and gender identities, and would be labeled as an "oppressor" on these bases by Defendants. William was obliged to profess himself complicit in "internalized privilege [which] includes acceptance of a belief in the inherent inferiority of the [corresponding] oppressed group" as well as supporting "the inherent superiority or normalcy of one's own privileged group." As a male, William's identities were "malicious and unjust" and "wrong" whether or not he was conscious of these alleged facts, and whether or not he was personally responsible for any acts or omissions. By professing his sexuality at the teacher's command, William would in effect be submitting to these derogatory labels. William and his fellow students were instructed that any denial of these characterizations itself amounts to unjust privilege "expressed as denial." William's female teacher instructed him that only members of the male sex were capable of committing "real life interpersonal oppression," because "interpersonal sexism is what men do to women." This was not descriptive instruction, but compulsory, graded normative exercises in which William was required to participate.

66. William and his mixed-race family belong to many of the groups characterized as "oppressive" and "wrong" by Defendants. The assignment of these derogatory labels based upon racial, sexual, gender, and religious upbringing created a hostile educational environment for William, who was raised according to Judeo-Christian precepts and traditions by his mother. Defendants' curriculum and Ms. Bass' actions labeled Christianity as an example of an oppressive

1   ideology and institution against which students should "fight back" and "unlearn." The material

2   makes explicit the "unlearning" is to take place in class, at the direction of the teacher. As William

3   was told by one slide: "We have a lot of unlearning to do." Defendants' exercises and class

4   programming were normative, not descriptive, and aimed to force an inward conversion regarding

5   personal moral and spiritual convictions they brought with them to the classroom from their

6   personal experiences and families.

7   67.   Professing one's racial, sexual, and religious identities on command, and exposing

8   those professions to the scrutiny of others, was a regular and official practice of the *Sociology of*

9   *Change* curriculum. The terms of this practice were authored by DPPS, as DPAC and DPPS

10   Defendants informed Plaintiffs in a mid-November meeting. "On the Google Doc write down your

11   individual identity," Ms. Bass directed William and his classmates in one virtual online session.

12   68.   "Fill out your identities again," she reiterated later. Individual identities to be

13   written down and submitted for grading included: "Race/Ethnicity/Nationality; Gender;

14   Socioeconomic Status; Disabilities; Religion; Age; Language."

15   69.   The above assignment was graded and the assignment sheet included an asterisked

16   caveat at the end: "This list is private! No one else will see it." The assurance proved to be false,

17   however, because the entry of identities was required to be submitted to the teacher, which she

18   could see and muse over; and although students like William did not know it, by entering their

19   intimate personal information onto the student assignment Google Doc database, it immediately

20   became visible to all DPAC teachers and administrators and remains so to this day, in

21   contravention of the written privacy assurance Defendants gave to William and his fellow students,

22   as Plaintiffs and counsel were later informed by Defendants in a mid-November meeting.

23   Defendants also conceded to Plaintiffs and counsel in a mid-November meeting that school

24   supervisors including Principal Johnson could and would "tune in" to the classroom sessions

25   unbeknownst to students like William, who were at the time in acute discomfort as their gender,

26   race, and sex were being confessed, interrogated, and judged on Zoom.

27   ///

28   ///

Litigator Law
ATTORNEYS AT LAW

70.     DPAC and DPPS Defendants, including Ms. Wall, conceded in meetings with Plaintiffs in mid-November and again in early December with counsel that required exercises and graded homework assignments involving identity confessions as described above indeed occurred. Defendants said in the mid-November meeting that revealing identities was "encouraged." Defendants, including Ms. Wall, refused to assure Plaintiffs that graded identity confession assignments or in class exercises would not occur again in future *Sociology of Change* and *Change the World* classes that William was required to attend for graduation.

71.     DPAC/DPPS Defendants' curriculum made attacks against the integrity of William and his mother's family relationships. Families "reinforce racist / homophobic prejudices." William's deceased father was white, and he died when William was too young to know him. The teacher presentation material purports to supply substantial information as to what sort of man he was, however, and what sort of relationship he had with William's African-American mother. "Interpersonal racism is what white people do to people of color close up," one *Sociology of Change* curriculum slide declares, with examples including "beatings and harassments." Defendants do admit that not all white people are guilty of individually performing such acts, but because white people belong to a "dominant group," invidious distinctions are justified: "Some people in the dominant group are not consciously oppressive…Does this make it OK? No!"

72.     With green eyes and blondish hair, William is generally regarded as white by his peers, and despite having a black mother, is so light skinned that he is usually presumed "white" by all others. He is the only light-skinned student in his class, and is regularly reminded of it.

73.     Predictably, one of William's first *Sociology of Change* sessions at DPAC, on or about September 10, 2020, erupted into racially charged tumult, and Ms. Bass terminated discussion when students, including William, objected to her derogatory, race-based labeling. Her actions both intimidated him from speaking out in class further and was an official endorsement of an ideology he could not affirm. This class session was conducted in a virtual online Zoom forum, and Mrs. Clark immediately complained about its disorder and intimidation to Principal Johnson. This initial online incident and sitting through classes described above traumatized William, discouraged and chilled his speech, and he did not want to participate further.

Litigator Law
ATTORNEYS AT LAW

74. His mother also did not want him to participate further, as she told DPAC/DPPS Defendants repeatedly, complaining specifically of the coercive identity revelations and the subsequent hostile environment Defendants were fostering. Defendants informed William that he must return to and complete the *Sociology of Change* class, or he would not be permitted to graduate from high school.

75. Plaintiffs spoke with school officials on multiple occasions beginning in September 2020 to express their conscientious objection to the programming of the class and assert their rights to abstain from participating in a class that was coercive, invasive, and discriminatory. But the response from increasingly higher levels of DPAC and DPPS officials was the same: if you do not participate, then you do not graduate. Mrs. Clark spoke with Principal Johnson on or about September 15, 2020, to discuss her and William's concerns about the abusive and discriminatory nature of the *Sociology of Change* class, as well as the identity confessions and labeling, which Defendants in a mid-November meeting would concede was "encouraged." Principal Johnson dismissed Plaintiffs' concerns, instead delivering a lecture on the virtues of "intersectionality" theory that inspired the class, and should inspire them. He denied the class had anything to do with "Critical Race Theory." He told Plaintiffs that the course was required for graduation and he would not allow William to opt out of participation.

76. On September 16, 2020, Mrs. Clark appealed in a written email to DPAC School Board President Morgan, copying Principal Johnson and DPPS assistant superintendent Ms. Wall. "My son is the only white student in this class, as far as we can tell. This teacher is blatantly justifying racism against white people thereby putting my son in emotional, psychological, and physical danger. This is not ok. Something needs to be done to remedy this situation immediately." She asked to be contacted immediately in order to discuss a workable solution.

77. On September 17, 2020, Mr. Morgan replied without any solution or offer of dialogue, instead laying out in an email a four-tier bureaucratic process through which William and Mrs. Clark would be required to process any complaints. Mr. Morgan was included in nearly every stage of negotiations for accommodation in correspondence and telephonic meetings with Plaintiffs from that point on.

78.     In a signed letter dated September 17, 2020, Principal Johnson wrote to Mrs. Clark that "[a]fter reviewing the documents from Ms. Bass, the course syllabus, and hearing your concerns, I have determined that the Sociology of Change course is still a valuable learning experience for William (and his classmates) and will continue to be a required course for graduation."

79.     Again, on October 12, 2020, Principal Johnson sent an email to Mrs. Clark in response to her and William's complaints about the discriminatory identity labeling, stating, "I know you have disagreements with some of the information shared in the Sociology of Change course, however, as I mentioned the course is required for graduation." On the same day Mrs. Clark responded: "William will not be attending Sociology of Change. The class violates his civil rights. Retaliation with threats to his graduating is also a violation of his civil rights. If you'd like to discuss an alternative to this class, I am available anytime."

80.     On October 19, 2020, Mrs. Clark sent an email to Mr. Morgan, Ms. Wall, and Principal Johnson stating, "William Clark will not be participating in any type of Critical Race Theory class. This includes but isn't limited to Sociology of Change. It's a direct violation of his civil rights. Mr. Adam Johnson has threatened retaliation by preventing William from graduating unless he submits to having his civil right violated. This is unacceptable."

81.     Principal Johnson replied on October 19, 2020 that William could not go and not do the assigned work if he chooses, and fail and be ineligible for graduation. Or he could complete a "minimum" of the exercises and assignments, and then receive a grade of a C-, the school's lowest passing grade, which might disqualify him from being considered for admission to his preferred colleges, but at least it would not be a failing grade. Or William could participate fully in the *Sociology of Change* class, pass with flying colors and face no grade penalty.

82.     These supposed concessions, both coercive and retaliatory against constitutionally protected speech and behavior, again forced Plaintiffs to choose between fidelity to conscience and their right to a public education.

///

///

83.     On October 29, 2020, Mrs. Clark requested via email to Ms. Wall, Mr. Morgan, and Principal Johnson, "I would like a course syllabus, assignment materials, and a detailed description of options that are being considered. I need those things in order to access how to move forward amicably. On another note, I have asked for William's last year's report card. We're trying to get ready for college, as this is William's senior year." Instead, Ms. Wall sent only a wholesome and vague *Sociology of Change* course syllabus that disguised the true nature of the class evident in the actual materials used on a day-to-day basis with students. No future "assignment materials" or other class literature was provided, no "detailed description of options." Extant course materials at issue appear to have been recently edited by Defendants.

84.     On November 16, 2020, Plaintiffs' then-counsel sent a letter to Ms. Wall, Principal Johnson, and Mr. Morgan seeking accommodation and informing them that their actions were illegal. After two meetings in November and December and in correspondence between Defendants and Plaintiffs' counsel, Defendants offered no reasonable accommodation, refused accommodations suggested, and refused to remove or change the failing grade without grade penalizations and returning to and completing the invasive, derogatory coursework at issue. Their intolerance of William and Mrs. Clark's principled objections to the *Sociology of Change* course material and Defendants' refusal to reach reasonable accommodation was aggressively dismissive of protected speech and behavior. Plaintiffs proposed accommodation with an alternative class, a virtual class at a local community college, or an extra credit assignment and Defendants declined each.

85.     Offering no reasonable accommodation, Defendants followed through on their threats of retaliation and gave William a D- for the *Sociology of Change* class, which by DPPS standards is failing. Principal Johnson delivered the news with an email to Mrs. Clark and William on November 20, 2020, copying Ms. Wall.

86.     The assignment of a D- grade for the *Sociology of Change* class taught and graded by Ms. Bass is a contravention of DPAC's own school handbook, and is intended as a malicious slight by Defendants against Plaintiffs, specifically designed to harm William's academic and professional career after high school.

87. According to the 2016-17 DPAC handbook, "Democracy Prep does not give Ds. We are aware that the lowest grade most colleges and universities will accept for entry is a C-. Because our mission is to send every DPPS scholar to the best colleges and universities, we align our grading practices with these standards." In retaliating against William for his protected speech, DPAC Defendants violated their own standards.

88. During the course of this ordeal, Mrs. Clark filed a complaint against DPAC with SPCSA. SPCSA staff did not investigate her complaint, but referred her to Ms. Wall at DPPS.

89. As a senior, William is working hard on other DPAC classes, despite the fear and loss of trust in school officials resulting from this ordeal. William has suffered severe mental and emotional distress as a result of Defendants' actions and the hostile environment created by their official actions, all of which has negatively impacted his academic performance, personal relationships, and future professional and academic prospects. He is in therapy addressing these harms as well as the ongoing harassment and discrimination that is being inflicted on him by Defendants under the guise of "civics."

90. Mrs. Clark is also personally suffering from the shock, anxiety, and guilt associated with having entrusted her son to adult custodians who have set upon "unlearning" the Judeo-Christian values she imparted to her son, and from exposing him to derogatory labeling and discrimination and retaliation on the basis of his perceived race, sexuality, and gender. She has suffered severe emotional distress as a result and is now experiencing consequent heart palpitations, weight gain, and insomnia. She has watched helplessly as Defendants doubled down again and again on their coercive ideological policy towards her son, threatening his graduation and academic and professional future.

91. After filing this Complaint, during the course of this litigation, Defendants represented to this Court that they would undertake voluntarily cessation of certain aspects of their challenged behavior, mooting the need for a preliminary injunction. (*See* ECF 93).

**FIRST CLAIM FOR RELIEF – FIRST AMENDMENT**

**(42 U.S.C. § 1983 – Compelled Speech & Retaliation)**

92. Plaintiffs incorporate by reference all previous paragraphs.

93.     The First Amendment protects the freedom of speech, which includes a "freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Bartnicki v. Vopper*, 532 U.S. 514, 553 (2001). The First Amendment's protection against compelled speech and government-imposed orthodoxies extend to students and school boards. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

94.     The First Amendment is applicable to public agencies in the State of Nevada through its incorporation by the Fourteenth Amendment.

95.     Defendants repeatedly compelled William's speech. Defendants compelled William to proclaim in class and in assignments his race, color, sex, gender, and religious identities for which he in turn would receive official, derogatory labels. Defendants' predetermined programming required William to accept and affirm that "privilege" and "oppressor" as officially defined by Defendants attached to himself in virtue of his professed identities, and then to reflect and be interrogated on this in a non-private setting within preset, ideologically loaded parameters set by Defendants.

96.     These unlawful actions were done with the specific intent to deprive William of his right to free speech, which Defendants do not value. Defendants and their employees and agents intended to violate William's right to free speech, and deliberately invade the sphere of intellect and spirit which it is the purpose of the First Amendment to protect.

97.     Defendants were deliberately indifferent to the consequences of their unlawful actions, actions which are overtly custom and practice for Defendant DPAC and DPPS, who authored and orchestrated curriculum programming at issue which was then approved and enforced in the face of Plaintiffs' objections by Defendants.

///

///

///

Litigator Law
ATTORNEYS AT LAW

98. Defendants' actions included malicious, coordinated retaliation for William's protected behavior, responses motivated by an animus for William given his perceived race, color, gender, and sexuality, disfavored identities which Defendants explicitly and openly judge. Defendants ruined William's college prospects, which were built on prior years' hard work and good grades. Defendants show no intention of altering their program of compelled speech in the future. Plaintiff seeks damages, including punitive damages, against Defendants.

99. SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

100. As a direct and proximate consequence of Defendants' unlawful acts, William has and continues to suffer damages for loss of his First Amendment rights, for pain and suffering, emotional distress, and damage to his academic and professional future and reputation.

## SECOND CLAIM FOR RELIEF – FIRST AMENDMENT VIOLATION

### (42 U.S.C. § 1983 – Viewpoint Discrimination & Retaliation)

101. Plaintiffs incorporate by reference all previous paragraphs.

102. "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality). When the government discriminates between ideas, viewpoint discrimination occurs.

103. The First Amendment is applicable to public agencies in the State of Nevada through its incorporation by the Fourteenth Amendment.

104. A classroom discussion in a social studies class among high school students is a nonpublic forum. The school may set reasonable regulations around such a forum, but it may not discriminate based on viewpoint within such a forum, nor may it use its pedagogical power over such a forum to discriminate or retaliate based on viewpoint.

///

///

///

Litigator Law
ATTORNEYS AT LAW

105.   On or about September 10, 2020, Ms. Bass terminated class discussion when students, including William, objected to a PowerPoint slide she showed in Defendants' *Sociology of Change* class stating that "Reverse Racism Doesn't Exist" and "Black Prejudice Does Not Affect the Rights of White People." William's stated objection was that everyone can be racist, that prejudice anywhere from anyone can harm others. For this protected speech and other comments like it, Ms. Bass terminated class discussion immediately with the intent to chill and discourage future objections to Defendants' preferred viewpoint.

106.   Ms. Bass' actions, and the subsequent coordinated efforts from Defendants to punish and fail William, were intended to chill protected speech that Defendants did not themselves share concerning their ideologically loaded program on race, gender, sexuality, and religion.

107.   Ms. Bass instructed William and others that denial of "privilege" which she attached to their identities was itself "privilege," and defined "privilege" in a non-descriptive, normative, and derogatory manner. Ms. Bass thus created a coercive environment where any objection from William was and would be officially labeled pejoratively. Defendants' program was intended to and did chill and discourage William's speech.

108.   Defendants, their agents, and employees threatened and punished William's objection to entering into and participating in the above viewpoint-transformation program and did so due to his perceived race, color, sex, and gender. The school's responses are unlawful retaliation that amounts to viewpoint discrimination.

109.   Defendants' subsequent responses targeted William but not other students because of the Defendants' disapproval of William's particular viewpoint.

110.   SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

///

///

**Litigator Law**
ATTORNEYS AT LAW

111.    As a direct and proximate consequence of these unlawful acts, William has and continues to suffer damages for loss of First Amendment rights, for pain and suffering, emotional distress, and damages to his academic and professional future and reputation.

<u>**THIRD CLAIM FOR RELIEF – FIRST AMENDMENT VIOLATION**</u>

**(42 U.S.C. § 1983 – Establishment Clause)**

112.    Plaintiffs incorporate by reference all previous paragraphs.

113.    The First Amendment prohibits Congress, and through the Fourteenth Amendment, the states, from establishing a religion. The Establishment Clause "forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993).

114.    The *Sociology of Change* curriculum taught by Mrs. Bass does just that: it communicates a message of disapproval, even condemnation, against the Judeo-Christian precepts in which he was raised, labeling it oppressive and in need of unlearning.

115.    SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

116.    As a direct and proximate consequence of these unlawful acts, William has and continues to suffer damages for loss of First Amendment rights, for pain and suffering, emotional distress, and damages to his academic and professional future and reputation.

<u>**FOURTH CLAIM FOR RELIEF – FOURTEENTH AMENDMENT VIOLATION**</u>

**(42 U.S.C. § 1983 – Equal Protection)**

117.    Plaintiffs incorporate by reference all previous paragraphs.

118.    The fundamental promise of the Equal Protection Clause is that every American will be treated equally by their government, regardless of their race, religion, or beliefs.

119.    Defendants failed to honor that promise to William – they intentionally treated him differently because of his skin color, his faith, and his beliefs.

///

120.   Defendants label some students, but not others, as "oppressors," a condition which is "malicious and unjust" and "wrong," solely by virtue of their racial, religious, and sexual identity. William was so labeled by his teacher for his gender, religious affiliation, and perceived race, while other students were not. Because of his apparent race and color – unique in his class – Defendants said William needed more "unlearning," more self-interrogation in view of other students similarly situated.

121.   When William sought an accommodation, Defendants retaliated by threatening and penalizing him, despite publicly encouraging other students to do exactly what William is doing now: "to use their voice to stand up for what is right, even if that means pushing back against a school policy." Defendants showed no intention of changing their behavior and acted on an animus for William's perceived race, gender, and sex, and Plaintiffs seek damages, including punitive damages, against them.

122.   SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

123.   As a direct and proximate consequence of these unlawful acts, William has and continues to suffer damages for loss of First Amendment rights, for pain and suffering, emotional distress, and damages to his academic and professional future and reputation.

### FIFTH CLAIM FOR RELIEF – FOURTEENTH AMENDMENT VIOLATION

### (42 U.S.C. § 1983 – Privacy)

124.   Plaintiffs incorporate by reference all previous paragraphs.

125.   The Fourteenth Amendment's promise of due process includes an "individual interest in avoiding disclosure of personal matters" by the government. *Whalen v. Roe*, 429 U.S. 589, 599 (1977). William's private views about his race, religion, and family are intimate and personal facts which the government should not broadcast, especially in the highly charged atmosphere of a high school where he could be unique because of his background and appearance.

///

126.   Despite Defendants' assurances to William and other students, Ms. Bass' identity exercises were not in fact private or limited to herself and classroom participants. Defendants conceded to Plaintiffs and counsel in a mid-November meeting that school supervisors, including Principal Johnson, could and would "tune in" to the classroom sessions unbeknownst to students like William, who were at the time in acute discomfort as their gender, race, and sex were being confessed, interrogated, and judged. SPCSA staff also have a right to conduct on-site visits.

127.   The same is true for the written, graded assignments requesting identity divulgence submitted to Ms. Bass on a database, which in fact was visible to all other DPAC teachers and supervisors, despite Ms. Bass' explicit and written assurances in Defendants' course material that submissions would be private.

128.   Defendants' program of directing and requiring students to reveal, "unlearn," and interrogate intimate matters relating to gender, sex, race, color, and religious identities violate William's right to privacy in his personal views.

129.   SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

130.   As a direct and proximate consequence of these ongoing unlawful acts, William has and continues to suffer damages for loss of First Amendment rights, for pain and suffering, emotional distress, and damages to his academic and professional future and reputation.

**SIXTH CLAIM FOR RELIEF – STATUTORY CIVIL RIGHTS VIOLATIONS**

**(Title VI Violation of 42 U.S.C. § 2000d et seq.)**

131.   Plaintiffs incorporate all preceding paragraphs herein by reference.

132.   Defendants SPCSA, DPAC, DPPS, and Democracy Prep Nevada are recipients of federal funds, and Defendants harassed and discriminated against William on the basis of actual and perceived race, sex, and religion in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. by intentionally supporting, promoting, and implementing the *Sociology of Change* class, with knowledge of its discriminatory content and application. This class created

Litigator Law
ATTORNEYS AT LAW

**Litigator Law**
ATTORNEYS AT LAW

a hostile educational environment for those students who are actually or perceived white, biracial, male, and Christian. Defendants' behavior treated William differently than other students on account of his racial, sexual, and religious identities. Title VI is privately enforceable.

133.    Defendants violated Title VI in two ways. First, they created a pervasively and persistently hostile educational environment for William based on his perceived race, gender, sex, and religion. The hostile messages were delivered over a substantial period of time and with official support and ratification.

134.    Second, Defendants discriminated against him based on those protected attributes. Though the school had a policy of not giving D- grades and of encouraging students to push back on school policies,[10] Defendants departed from this stated policy with respect to William.

135.    William belongs to a protected minority racial group, he was subject to unwelcome insults, judgment, harassment, and discrimination by being labeled and judged by Ms. Bass and the *Sociology of Change* curriculum she delivered, that harassment was based on race, religion, and sex, the harassment was severe, abusive, and pervasive and altered the conditions of his education, and DPAC and DPPS as institutions have designed, implemented, defended, and ratified these materials.

136.    SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

137.    Plaintiffs have been and will continue to be injured by Defendants' unlawful and discriminatory actions, which resulted in emotional distress, trauma, and included overt retaliation described in detail above, and Plaintiffs are entitled to compensatory and punitive damages.

///

///

///

---

[10] *See* ECF No. 1 at p. 24 (image of tweet from @DemocracyPrep, March 30, 2020) ("We also want Democracy Prep scholars to feel empowered to use their voice to stand up for what is right, even if that means pushing back against a school policy, occupying a cafeteria, or staging a walkout.").

**SEVENTH CLAIM FOR RELIEF –**

**STATUTORY SEX DISCRIMINATION VIOLATIONS**

**(Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq.)**

138.   Plaintiffs incorporate all preceding paragraphs herein by reference.

139.   Just as Title IV prohibits discrimination in federally funded educational programs based on race, Title IX prohibits discrimination in federally funded educational programs based on sex.

140.   Defendants violated Title IX in their deliberate indifference and active promotion of the ongoing abuse and harassment William endured in DPAC's *Sociology of Change* class.

141.   Title IX protects students from sex discrimination when they are engaged in education programs and activities that receive federal financial assistance. Among the types of sex discrimination that Title IX expressly prohibits is creating a hostile educational environment. Title IX gives individuals a private right of action.

142.   After being repeatedly directed to divulge his sexual and gender identities, school officials as custom and policy and in direct acts described above publicly labeled, repeatedly categorized, and stereotyped William's sexual and gender identities in a deliberately pejorative and offensive manner. William was compelled to participate in this process of publicly professing identity, receiving in turn derogatory designation of "oppressor" on the basis of his sex and gender identities. This included inherent "internalized privilege [which] includes acceptance of a belief in the inherent inferiority of the [corresponding] oppressed group" as well as the "the inherent superiority or normalcy of one's own privileged group." This is a condition inherent to Plaintiff's sex and gender which is "malicious and unjust" and "wrong" whether conscious or not. Denial of these qualities inherent to Plaintiff's sex and gender is itself privilege "expressed as denial." Only William's sex can commit "real life interpersonal oppression," William's female teacher told him, since "interpersonal sexism is what men do to women."

143.   William belongs to a targeted group, he was subject to unwelcome insults, judgment, harassment, and discrimination by being labeled and judged by Ms. Bass and the *Sociology of Change* curriculum she delivered, that harassment was based on his male sex and

Litigator Law
ATTORNEYS AT LAW

gender, the harassment was severe, abusive, and pervasive and altered the conditions of his education, and DPAC and DPPS as institutions have designed, implemented, defended, and ratified these materials.

144.    SPCSA Defendants are responsible for authorizing DPAC's charter, knowing of its 'unique' approach to civics curriculum, and for reviewing DPAC's curriculum and operations to ensure civil rights violations like this do not occur. They have in place a series of procedures to review, visit, inspect, and ensure compliance, and yet they failed in that responsibility here.

145.    William has been injured by Defendants' unlawful and discriminatory actions, which resulted in emotional distress, trauma, and included overt retaliation described in detail above, and Plaintiffs are entitled to compensatory and punitive damages.

## EIGHTH CLAIM FOR RELIEF – STATUTORY VIOLATION OF PUPIL RIGHTS

### (Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h)

146.    Plaintiffs incorporate all preceding paragraphs herein by reference.

147.    The Protection of Pupil Rights Amendment is a federal law which prohibits any educational agency with federal funding from requiring a student "to submit to a survey, analysis, or evaluation that reveals information concerning—(1) political affiliations or beliefs of the student or the student's parent; …(3) sex behavior or attitudes; (4) illegal, anti-social, self-incriminating, or demeaning behavior; (5) critical appraisals of other individuals with whom respondents have close family relationships; …(7) religious practices, affiliations, or beliefs of the student or student's parent; or (8) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program) without the prior consent of the student (if the student is an adult or emancipated minor), or in the case of an unemancipated minor, without the prior written consent of the parent." 20 U.S.C. § 1232h(b).

148.    Further, "All instructional materials, including teacher's manuals, films, tapes, or other supplementary material which will be used in connection with any survey, analysis, or evaluation as part of any applicable program shall be available for inspection by the parents or guardians of the children." 20 U.S.C. § 1232h(a).

///

149.     Defendants did not obtain Mrs. Clark's consent for her son to take the identity survey administered by Ms. Bass.

150.     Defendants did not comply with Mrs. Clark's October 29, 2020, request to inspect **all** instructional materials, including the supplementary materials, associated with the survey administered by Ms. Bass.

151.     Mrs. Clark's rights as a parent were harmed by this failure by Defendants.

### NINTH CLAIM FOR RELIEF – BREACH OF CONTRACT

152.     Plaintiffs incorporate all preceding paragraphs herein by reference.

153.     The DPAC "Scholar & Family Handbook" ("Handbook") (ECF No. 1-4) constitutes a contract between DPAC and its students and families; it sets forth the expectations for each, and consideration is exchanged in its support: students and parents elect to enroll into DPAC, and thus to direct taxpayer dollars to DPAC, in exchange for educational services.

154.     In the Handbook, DPAC promises that its teachers will "protect . . . the rights of all individuals in the classroom." (pg. 6).

155.     In the Handbook, DPAC promises that it will "not discriminate in admission to, access to, treatment in, or employment in its services, programs and activities, on the basis of race, color, or national origin, in accordance with Title VI of the Civil Rights Act of 1964 (Title VI); [or] on the basis of sex, in accordance with Title IX of the Education Amendments of 1972 . . ." (pg. 40). DPAC further promises that it is committed "to maintaining a school environment free of harassment based on race, color, religion, national origin, age, gender, sexual orientation, or disability. Harassment by administrators, certified and support personnel, scholars, vendors and other individuals at school or at school-sponsored events is unlawful and is strictly prohibited." (pg. 40).

156.     William and Mrs. Clark have been injured by Defendants' breach of contract, which resulted in emotional distress, trauma, and included overt retaliation described in detail above, and Plaintiffs are entitled to compensatory and punitive damages.

///

///

**TENTH CLAIM FOR RELIEF –**

**THIRD PARTY BENEFICIARY BREACH OF CONTRACT**

157.   Plaintiffs incorporate all preceding paragraphs herein by reference.

158.   The charter between SPCSA and DPAC is a legally enforceable contract. ECF 1-3.

159.   The students of DPAC are the obvious, foreseeable, third-party beneficiaries of that contract. *See Elizabeth E. v. ADT Sec. Sys. W.*, 108 Nev. 889, 894, 839 P.2d 1308, 1311 (1992). The first recital in the contract states that "[t]he primary consideration of the legislature in enacting legislation to authorize charter schools is to serve the best interests of all pupils." Similarly, the recitals later state the purposes of all those involved in the charter school system are to "[i]mprove the learning of pupils" and "[i]ncrease the opportunities for learning and access to quality education by pupils."

160.   In that contract, DPAC promises to "operate at all times in accordance with all federal and state laws." (1.4.3). DPAC acknowledges that it must follow "applicable provisions of local, state and federal law and regulation, specifically including . . . civil rights . . ." (1.4.4).

161.   In that contract, DPAC promises it "shall not discriminate against any student, employee or other person on the basis of race, color, creed, ethnicity, national origin, gender, marital status, religion, ancestry, disability, sexual orientation, sex, gender identity or expression. . . ." They further promise to "take all steps necessary to ensure that discrimination does not occur, as required by federal civil rights law." (2.4.1).

162.   Mrs. Clark and William relied on these promises between SPCSA and DPAC to know that William would attend a safe, respectful, accredited public charter school.

163.   Mrs. Clark and William were damaged by the SPCSA and DPAC's failure to live up to the promises each made.

**ELEVENTH CLAIM FOR RELIEF – PARENTS' RIGHTS**

**(42 U.S.C. 1983 – Fourteenth Amendment)**

164.   The preceding paragraphs are incorporated herein by reference.

///

///

165.   "The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court" under the Fourteenth Amendment's substantive due process clause. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This includes the "the power of parents to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923).

166.   Defendants engaged in a concerted campaign to transform William's beliefs and values, including his beliefs about the very nature of the family itself (saying, for instance, that family "reinforce[s] racist/homophobic prejudices") and the faith in which he was raised, to a new set of beliefs and values that Defendants preferred.

167.   This damaged Mrs. Clark's rights as a parent to raise her son. It caused her severe anxiety and stress.

## **TWELFTH CLAIM FOR RELIEF – STATUTORY STUDENT EXPRESSION**

168.   The preceding paragraphs are incorporated herein by reference.

169.   Nevada state law provides, "Each pupil of a public school, including, without limitation, each pupil of a university school for profoundly gifted pupils, is entitled to express himself or herself in a manner consistent with the rights guaranteed by the First and Fourteenth Amendments to the United States Constitution." Nev. Rev. Stat. Ann. § 388.077(1).

170.   Nevada state law further provides, "The board of trustees of each school district, the governing body of each charter school and the governing body of each university school for profoundly gifted pupils shall adopt a policy prescribing procedures for the resolution of a complaint by a pupil of the school district, charter school or university school for profoundly gifted pupils that the rights of the pupil described in subsection 1 or 3 have been violated. The policy required by this subsection may be part of a comprehensive discrimination grievance policy of the school district, charter school or university school for profoundly gifted pupils or may be a separate policy." Nev. Rev. Stat. Ann. § 388.077(4).

171.   The DPAC Defendants and Ms. Bass violated Nev. Rev. Stat. Ann. § 388.077(1) by cutting off classroom discussion that was student expression consistent with the First and Fourteenth Amendments.

172.     The DPAC Defendants violated Nev. Rev. Stat. Ann. § 388.077(4) because nothing in the DPAC Student & Family Handbook constitutes a policy for resolution of complaints that a student's rights to express himself as protected by the First and Fourteenth Amendments has been violated.

173.     DPAC's failure to follow these statutes damaged William and Mrs. Clark by failing to advise them of their rights ahead of time and by failing to provide an appropriate procedure for them to remedy this failure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.     Issue a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201:

a.     that requiring students to reveal racial, sexual, gender, and religious identities in a public-school classroom and graded assignments is unconstitutional compelled speech;

b.     that punishing students for thoughtfully articulating their views in a high school classroom's social studies discussion is unconstitutional viewpoint discrimination;

c.     that telling students that belonging to the Christian faith is the mark of an oppressor that must be unlearned violates the Establishment Clause;

d.     that a teacher labeling and publicly judging students based on their race, sex, and religion violates the Equal Protection Clause;

e.     that requiring students to tell their teacher and classmates their private, personal views as to intimate details of their identity, such as their race, sex, gender, sexual orientation, family income, and faith violates their privacy rights under the Fourteenth Amendment;

f.     that curriculum that consistently labels students as oppressors and publicly judges them for their innate and chosen characteristics, such as race, religion, and sex, creates a hostile educational environment in violation of Title VI and Title IX;

///

g.    that classroom assignments to disclose a student's race, religion, gender, sexual orientation, faith, and family income to a teacher constitute a survey under the Protection of Pupil Rights Amendment, for which a parent's consent must first be secured; and;

h.    that curriculum that seeks to transform students' views on race, religion, sex, gender, and politics violate parents' rights to control the education of their own on the most important matters in their children's lives.

2.    Issue a permanent injunction prohibiting Defendants DPAC and DPPS and their officers and employees from failing to follow through on the commitments it has made in ECF 93;

3.    Issue a permanent injunction enjoining and restraining DPAC and DPPS Defendants and their officers and employees from engaging in the policies, practices, and conduct that violates the declaratory judgments requested above;

4.    Issue a permanent injunction enjoining and restraining the SPCSA Defendants from reauthorizing DPAC's charter unless it modifies its curriculum to no longer contain material that violates the declaratory judgments requested above, and adopts student expression and protection of pupil rights policies required by law;

5.    Award nominal, compensatory, and punitive damages;

6.    Award Plaintiffs their attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

7.    Grant such other relief as this Court deems just and proper.

///

///

///

1    **DEMAND FOR JURY TRIAL**

2    Plaintiffs demand a jury trial on any issue triable of right by a jury pursuant to FRCP 38(b).

3    DATED this 3rd day of May, 2021.

4                                              LITIGATOR LAW

5

6                                   By /s/ William D. Schuller, Esq.
                                       ALAN J. LEFEBVRE, ESQ.
7                                      Nevada Bar No. 000848
                                       WILLIAM D. SCHULLER, ESQ.
8                                      Nevada Bar No. 011271
                                       11830 Tevare Lane #1062
9                                      Las Vegas, Nevada 89138

10                                     LIBERTY JUSTICE CENTER

11

12                                  By /s/ Daniel R. Suhr, Esq.
                                       DANIEL R. SUHR, ESQ.
13                                     JEFF JENNINGS, ESQ.
                                       208 S. LaSalle St. Suite 1690
14                                     Chicago, Illinois 60604
                                       dsuhr@libertyjusticecenter.org
15                                     jjennings@libertyjusticecenter.org
                                       *Pro Hac Vice Applications Forthcoming*

16                                     Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

**Litigator Law**
ATTORNEYS AT LAW

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, LR IC4-1, and LR 5-1, I hereby certify that I am an employee of Litigator Law, and that on the 3rd day of May 2021, I caused to be served a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** in the following manner:

The Court's Electronic Filing System to all parties on the current service list:

Adam Amir            Adam.Amir@wilmerhale.com

Alan Schoenfeld       alan.schoenfeld@wilmerhale.com

Allyson Slater        Allyson.Slater@wilmerhale.com

Brian R. Hardy        bhardy@maclaw.com, mmonkarsh@maclaw.com

Brittany B. Amadi     Brittany.Amadi@wilmerhale.com

Christopher S. McAbee       Scott.McAbee@wilmerhale.com

Debo Adegbile        Debo.Adegbile@wilmerhale.com, whdocketing@wilmerhale.com

Eleanor Davis        Eleanor.Davis@wilmerhale.com

George P. Varghese   george.varghese@wilmerhale.com

Kara B. Hendricks    hendricksk@gtlaw.com, flintza@gtlaw.com, lvlitdock@gtlaw.com, neyc@gtlaw.com, rabeb@gtlaw.com, sheffieldm@gtlaw.com

Mark E. Ferrario     ferrariom@gtlaw.com, lvlitdock@gtlaw.com, rosehilla@gtlaw.com, sheffieldm@gtlaw.com

Ryan W. Herrick      rherrick@spcsa.nv.gov, jennifer.king@spcsa.nv.gov

Susan Gillespie      sgillespie@maclaw.com, smong@maclaw.com

Swapna Maruri        swapna.maruri@wilmerhale.com

/s/ William D. Schuller, Esq.
An Employee of LITIGATOR LAW